RICHARD A. HEIM *v.* CALIFORNIA
FEDERAL BANK ET AL.
(AC 23105)

Foti, Flynn and Healey, Js.

Argued February 20—officially released July 29, 2003

*Richard A. Heim*, pro se, the appellant (plaintiff).

*Rodd J. Mantell*, with whom was *Christopher P. Kreisen*, for the appellee (defendant Reiner, Reiner and Bendett, P.C.).

*Opinion*

HEALEY, J. The pro se plaintiff, Richard A. Heim, appeals from the judgment of the trial court, rendered subsequent to its granting of the motion to strike filed by the defendant Reiner, Reiner and Bendett, P.C., a Connecticut law firm.[1] This action involves the circumstances and conduct of the parties, especially that of the defendant banks, First Nationwide Mortgage Corporation (First Nationwide), California Federal Bank, FSB (Calfed), and Telebank, in a foreclosure action brought concerning a mortgage loan on a condominium owned by the plaintiff in Cromwell. The lengthy[2] revised complaint sets forth nine causes of action.[3]

---

[1] Unless otherwise specified in this opinion, we shall refer to Reiner, Reiner and Bendett, P.C., as the defendant. We refer to the other defendants, First Nationwide Mortgage Corporation, California Federal Bank, FSB, and Telebank, collectively, as the banks.

[2] In total, the revised complaint included some 250 allegations.

[3] The nine counts allege the following causes of action: Count one—violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq.; count two—violation of General Statutes § 52-568, groundless or vexatious action; count three—negligence; count four—intentional infliction of emotional distress; count five—libel; count six—abuse of pro-

The defendant filed a motion to strike counts one, two, four, five, six and nine as "asserted against them because they are legally insufficient."[4] The court filed a written memorandum of decision in which it granted the defendant's motion with respect to all counts. Thereafter, the plaintiff appealed from the court's ruling striking counts three, four and nine as to the defendant.

On appeal, the plaintiff claims that the court improperly struck (1) count three in the absence of any motion to strike that count by the defendant, (2) count four on the ground that the defendant had failed to allege extreme or outrageous conduct and (3) count nine on the ground that it had failed to allege harassing, abusive or unfair practices or any other specific violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. We agree with the plaintiff with respect to counts three and nine and, accordingly, reverse those parts of the judgment. We conclude, however, that the court properly struck count four and therefore affirm that part of the judgment.

I

Drawing on the allegations[5] set forth in the plaintiff's revised complaint at this point will serve to furnish the

cess; count seven—breach of accord and satisfaction; count eight—breach of the duty of good faith and fair dealing; and count nine—violation of 15 U.S.C. § 1692 et seq.—the Fair Debt Collection Practices Act.

Counts one through six were brought against all the defendants. Counts seven and eight were brought against only the banks. Count nine was brought against only the defendant.

[4] On March 16, 2001, First Nationwide and Calfed filed a motion to strike on the basis of misjoinder, nonjoinder or failure to state a claim on which relief could be granted. On March 30, 2001, Telebank filed a motion to strike on the basis of misjoinder and the failure to state a claim on which relief could be granted. The court granted the banks' motion on the basis of the failure to state a claim on which relief could be granted with respect to counts one, two, three, four, five, six, seven and nine, and denied the motion with respect to count eight.

[5] At the outset, we point out that due to the procedural posture of this case, "we assume the truth of both the specific factual allegations and any facts fairly provable thereunder. In doing so, moreover, we read the

background helpful for our discussion of the issues to be resolved. In 1987, the plaintiff purchased a certain premises in Cromwell. He executed a mortgage deed and note in connection with that purchase. In 1996, First Nationwide, the owner of the mortgage deed and note, issued a statement in December, 1996, notifying the plaintiff that it was buying all the assets and liabilities of Calfed and the merger, to be effective on or about March 21, 1997, would result in a new entity, California Federal Bank. The plaintiff, who had an unpaid balance on his mortgage loan at that time, relied on the representation that the new company was the owner and holder of his mortgage. Prior to 1997, the plaintiff suffered from continuing, multiple health problems and was no longer able to manage his premises. On April 9, 1997, before his mortgage was accelerated on default and without prior notification to the banks, he executed a quitclaim deed to Calfed, giving title to the premises and to all the appliances. He also granted Calfed the right to collect past and future rents. The plaintiff thereupon delivered the deed, the keys to the premises, the lease, a security deposit belonging to the tenants, a signed conveyance tax statement and a copy of the notice of deed with the original, which he had recorded in the Cromwell land records. In addition, he sent a cover letter to Calfed for a receipt of such documents; the letter[6] also set forth his health problems. The plaintiff sent all the items referred to Calfed by certified mail, requesting acknowledgement of receipt.[7] The deed recited "that it was in lieu of foreclosure and

---

allegations broadly, rather than narrowly." (Internal quotation marks omitted.) *Craig* v. *Driscoll*, 262 Conn. 312, 321, 813 A.2d 1003 (2003).

[6] In the cover letter, the plaintiff informed Calfed and First Nationwide that he "planned to relocate out west in a short time." The plaintiff was never contacted by Calfed or First Nationwide until many months after he had forwarded the cover letter with the enclosed items.

[7] The cover letter and the enclosed items addressed to Calfed were received and signed for by First Nationwide. In 1997, the banks all used the same address.

all judgments" and stated that the "premises had a fair market value at [that] time of about the balance of said note." The plaintiff alleged in count one of his complaint that "[i]n spite of all of the foregoing, and while holding said deed and keys and security deposit and other items, and while in control of [the] premises, Defendants Calfed and First Nationwide, using the name Telebank, or acting in concert with the Defendant, Telebank, engaged the services of, and acted in concert with, the Defendant . . . ."

According to the plaintiff, the defendant "was aware of the [substantial] facts from its . . . clients and from [the] Land Records when it nonetheless instituted a foreclosure suit against the Plaintiff . . . ." The plaintiff alleged that the defendant and the banks instituted a foreclosure action about seven months after the materials had been mailed by the plaintiff, who had relied on the receipt of the cover letter and materials by CalFed, as well as the absence of contact in the interim. The plaintiff also alleged that in that foreclosure action, "[a]ll [the] Defendants omitted or allowed to be omitted [any reference to the] recorded Notice of Deed and [the] delivery of and retention of deed, keys [and] security deposit . . . ." In addition, the action was instituted about four months after the plaintiff had established a new home in Wisconsin[8] under a lease. The plaintiff further alleged in his complaint that all the defendants "knowingly allowed and caused to be issued" the foreclosure action against the plaintiff "without [the] Defendants, Telebank, Calfed and First Nationwide [owning] record title to [the] mortgage [deed] and note," and, further, that Telebank "did not obtain record title until December 11, 1998 from Provident Bank, some thirteen months after said return [date] . . . ."

---

[8] The plaintiff alleged in his complaint that as of July, 1997, all the defendants knew or had reason to know of his address in Wisconsin.

As a result, the plaintiff was forced to give up his Wisconsin home, return to Connecticut, hire counsel and remain here to assist his counsel. Since November, 1997, the complaint alleged, the defendant, and then the banks, "largely neglected and refused to respond to numerous attempts by [the] plaintiff and counsel to resolve the [matter] by agreement . . . ." The mortgage debt was increased by the inaction and delay, resulting in a judgment of foreclosure against the defendant on April 19, 1999, in which the court found that the debt was about $82,000, about $20,000 higher than the debt in April, 1997.[9]

The plaintiff further alleged that all the defendants "withheld" from the plaintiff copies of the foreclosure documents that were filed at the hearing until the court ordered them to furnish such copies to the plaintiff. The defendant issued a written notice to the plaintiff that the time set for the foreclosure hearing on April 19, 1999, was 10:30 a.m., instead of 9:30 a.m., as previously ordered by the court. The plaintiff also alleged that the court found the Cromwell premises to be worth $62,000 on the basis of a filed affidavit, made a "strong suggestion" that the defendants not attempt to obtain a deficiency judgment and that if such an attempt was made, the court "could make certain findings at such time against [the] same . . . ."[10] The plaintiff alleged that approximately twenty-two days after the foreclosure hearing, the banks took title to the premises, maintaining their control over it and the appliances. On or about May 20, 1999, a motion for a deficiency judgment

[9] The plaintiff also alleged that during that time period, the foreclosure action was "in dormancy status on and off for six months." In addition, the plaintiff alleged that the banks had "neglected and refused" to respond to his offers "to give title to any of them and to reserve [his] defenses so as to minimize [the] debt . . . ."

[10] At that hearing, the plaintiff alleged, the court "specially retained continuing equity jurisdiction over the file in case such suggestion [was] not heeded."

was filed. The plaintiff alleged that when that motion came up for a hearing on June 7, 1999, all the defendants "neglected and refused" to prosecute it. The plaintiff claimed that he wrote to the defendants requesting that they either advance the pending motion or withdraw it, but that he was ignored, either to punish him or to induce him to leave Connecticut so that they could then proceed toward a deficiency judgment without opposition. Thereafter, the banks, acting through the defendant, wrote a letter to the plaintiff that the plaintiff alleged contained several lies. The court, without objection from the defendants, granted the plaintiff's motion to dismiss the motion for a deficiency judgment for lack of due diligence. In connection with the various matters, the plaintiff had to appear in court several times.[11]

On February 26, 2001, the defendant filed a motion to strike pursuant to Practice Book § 10-42.[12] In its motion, the defendant set forth as to each count the reasons for seeking to have those counts stricken. Nowhere in that motion or the accompanying memorandum of law did the defendant refer to count three of the complaint. After a hearing, the court issued its written decision.[13] In the decision, the court discussed its rea-

---

[11] The plaintiff alleged that he appeared in court on the following dates in 1999: February 22, March 15, April 19, June 7, June 28, August 23 and November 29. The plaintiff further alleged that he "had to, to protect himself, remain in Connecticut for four months" after the notice of the dismissal "so as to deal with any possible motions by [the] Defendants to open that dismissal."

[12] Practice Book § 10-42 provides: "(a) Each motion to strike must be accompanied by an appropriate memorandum of law citing the legal authorities upon which the motion relies.

"(b) Any adverse party who objects to this motion shall, at least five days before the date the motion is to be considered on the short calendar, file and serve in accordance with Sections 10-12 through 10-17 a memorandum of law."

[13] As to count three, the court's memorandum stated: "3. Count [three] alleges negligence apparently against Telebank, [First Nationwide] and Calfed for failing to respond to the alleged tender of deed and keys or to return the keys with a letter of rejection. Plaintiff has failed to allege any

soning as to each count on which it acted. Significantly, the court set forth the allegations contained in count three and concluded that the plaintiff had failed to allege any duty owed by the defendant. That was done despite the failure of the defendant to include any reference to count three in its February 26, 2001 motion to strike.[14] The court, without much discussion regarding count three, specifically struck that count.[15] In the conclusion to its decision, the court stated that the "[m]otion to strike by [the defendant is] granted as to all counts [including counts four and nine] directed to the [defendant]." This appeal followed. Additional facts will be set forth as necessary.

## II

Preliminarily, we set out the standard of review applicable to the plaintiff's appeal challenging the court's ruling in striking[16] counts three, four and

duty on the part of [First Nationwide] or Calfed to respond to him or to turn the keys over to Telebank.

"Plaintiff further claims that these defendants were negligent in failing to bring a foreclosure action within a 'reasonably short time' after the plaintiff failed to make the March 1, 1997 mortgage payment, but that action, instituted in November, 1997, some eight months later, cannot be said to be so untimely as to sustain an action for negligence."

[14] It is interesting to note that our review of the court file reveals that the defendant filed a motion to strike count three on January 15, 2002, but withdrew it on January 22, 2002.

[15] The court granted the banks' motion to strike with respect to counts one, two, three, four, five, six, seven and nine, and denied the motion with respect to count eight.

[16] Practice Book § 10-39 (a) provides: "Whenever any party wishes to contest (1) the legal sufficiency of the allegations of any complaint, counterclaim or cross claim, or of any one or more counts thereof, to state a claim upon which relief can be granted, or (2) the legal sufficiency of any prayer for relief in any such complaint, counterclaim or cross complaint, or (3) the legal sufficiency of any such complaint, counterclaim or cross complaint, or any count thereof, because of the absence of any necessary party or, pursuant to Section 17-56 (b), the failure to join or give notice to any interested person, or (4) the joining of two or more causes of action which cannot properly be united in one complaint, whether the same be stated in one or more counts, or (5) the legal sufficiency of any answer to any complaint, counterclaim or cross complaint, or any part of that answer

nine.[17] "The standard of review for granting a motion to strike is well settled. In an appeal from a judgment following the granting of a motion to strike, we must take as true the facts alleged in the plaintiff's complaint and must construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . A motion to strike admits all facts well pleaded. See Practice Book § [10-39]. A determination regarding the legal sufficiency of a claim is, therefore, a conclusion of law, not a finding of fact. Accordingly, our review is plenary. . . . If facts provable in the complaint would support a cause of action, the motion to strike must be denied. . . . Moreover, we note that [w]hat is necessarily implied [in an allegation] need not be expressly alleged." (Citations omitted; internal quotation marks omitted.) *Bell* v. *Board of Education*, 55 Conn. App. 400, 404, 739 A.2d 321 (1999).

We turn first to count three, which sounds in negligence. We incorporate here what we previously have set out as the background circumstances. We must, however, supplement our discussion with the circumstances peculiar to that count. The plaintiff claims that this usual standard of review is not to be used here because the defendant never filed a motion to strike count three. Rather, the plaintiff states that our review should be limited to whether the court had "statutory or legal authority" to strike the count. Under the peculiar circumstances of this case, we are inclined to agree with the plaintiff.

In claiming that the court acted inappropriately in striking count three, the plaintiff argues that the court (1) had no statutory or legal authority to strike count three as to the defendant, whose motion to strike failed

including any special defense contained therein, that party may do so by filing a motion to strike the contested pleading or part thereof."

[17] Additional principles of law applicable to the other counts stricken by the court will be noted during the discussion of such counts seriatim.

to include said count, and (2) in acting sua sponte, in the absence of a motion to strike filed by the opposing party, was in violation of our holding set forth in *Yale University School of Medicine* v. *McCarthy*, 26 Conn. App. 497, 501–502, 602 A.2d 1040 (1992), and Practice Book §§ 10-39 through 10-45, inclusive. The defendant, on the other hand, contends that *McCarthy* does not apply because the issue of whether the action was legally sufficient was not before the court in *McCarthy* and, therefore, that court "could not properly rule on the issue." In the present case, however, the defendant argues that the issue of the legal sufficiency of count three was, in fact, before the court as a result of the banks' motions to strike count three. According to the defendant, therefore, the court did not act sua sponte and properly struck count three as directed to the defendant. We are not persuaded by the defendant.

Initially, the plaintiff, in parsing the court's memorandum of decision, set forth in his principal brief certain excerpts that he claims show that the court "did not consider the [defendant] to be charged in count three with reference, but merely concluded with a catchall ruling." [18] Those excerpts, which are not taken out of context, reasonably lend themselves to such an interpretation; however, they are not crucial to our resolution of the issue as to count three, but merely provide insight.

The court did not have the legal or statutory authority to strike count three as it did. To be sure, a court has the authority to grant a motion to strike under proper circumstances. See Practice Book § 10-39 et seq. In this

---

[18] The excerpts referred to by the plaintiff in his principal brief are: "a. motion to strike by [the defendant] granted as to all counts directed to the [defendant] . . . b. On February 23, 2001, [the defendant] moved to strike all the counts in which it is named as a defendant . . . c. Count three alleges negligence *apparently* against Telebank, [First Nationwide] and Calfed . . . ." (Emphasis added.)

case, however, it is not necessary for us to reach the issue of whether count three was vulnerable to a motion to strike, as the defendant contends.[19] That is so because we consider the court's sua sponte dismissal of count three inappropriate because of the absence of a motion to strike by the defendant.[20] See *Yale University School of Medicine* v. *McCarthy*, supra, 26 Conn. App. 501. We reject the defendant's claim that *McCarthy* is not applicable to this case.

In *McCarthy*, the plaintiff filed an action to recover money allegedly owed for medical services. Id., 498. The defendant filed several special defenses and a coun-

[19] The defendant argues that even if we find that the court improperly struck count three, this court, under the auspices of plenary review, should affirm the trial court's decision because the plaintiff was not owed a duty by the defendant and, therefore, any claim of negligence must fail. The defendant continues by stating that if we reverse the judgment, judicial resources would be wasted.

We decline the defendant's invitation to review the claim, not decided at trial, that the plaintiff's complaint fails to allege a duty owed. We have stated: "We do not believe that plenary review encompasses review of a claim . . . *never decided by* the trial court. [B]ecause these issues were not adjudicated in the trial court, the record before us is incomplete. *Helicopter Associates, Inc.* v. *Stamford*, 201 Conn. 700, 718, 519 A.2d 49 (1986); *Brehm* v. *Brehm*, 65 Conn. App. 698, 702–703, 783 A.2d 1068 (2001); cf. *State* v. *Dabkowski*, 199 Conn. 193, 198, 506 A.2d 118 (1986) (claims functionally made and the record [was] adequate for [appropriate] review); *Salmon* v. *Dept. of Public Health & Addiction Services*, 259 Conn. 288, 305, 788 A.2d 1199 (2002) (claims reviewed where Supreme Court persuaded plaintiff functionally raised [the] issue in *both* the administrative and trial court proceedings)." (Emphasis in original; internal quotation marks omitted.) *Raymond* v. *Zoning Board of Appeals*, 76 Conn. App. 222, 232 n.15, 820 A.2d 275, cert. denied, 264 Conn. 906, 826 A.2d 177 (2003).

[20] We are aware that "[i]t is incumbent on the plaintiff to allege some recognizable cause of action in his complaint," and that "[i]f he fails so to do, it is not the burden of the defendant to attempt to correct the deficiency, either by motion, [motion to strike] or otherwise." (Internal quotation marks omitted.) *Robert S. Weiss & Associates, Inc.* v. *Wiederlight*, 208 Conn. 525, 535 n.5, 546 A.2d 216 (1988). Nevertheless, the defendant, if it wants to have a portion of the complaint stricken, must take some affirmative action, be it a written motion, an oral motion or otherwise. See *Brill* v. *Ulrey*, 159 Conn. 371, 374, 269 A.2d 262 (1970).

terclaim alleging medical malpractice. Id. The defendant failed to file a certificate of good faith, as required by General Statutes § 52-190a.[21] Id. The court, sua sponte, dismissed the counterclaim due to the defendant's failure to file the certificate. Id., 499. The defendant appealed, arguing that the certificate requirement did not apply. Id., 501. This court held that it was unnecessary to reach the issue framed by the defendant, as *"the trial court's sua sponte dismissal of the defendant's counterclaim was improper because of the absence of a motion to strike by the* plaintiff." (Emphasis added.) Id. We further stated that *"[t]here was no statutory or other legal authority for the trial court's dismissal . . . ."* (Emphasis added.) Id., 502.

The defendant claims that *McCarthy* is inapposite because the issue of striking the defendant's counterclaim in *McCarthy* was not before that court. The defendant in his brief contends that in the present case, the court did not act sua sponte because the "banks filed motions to strike count three, requiring the trial court to decide if [the plaintiff's] claim [in count three] was legally sufficient." The defendant maintains that the court acted on the issue before it and did not, therefore, act sua sponte. The defendant argues also that because count three alleged that "[it] and the banks *acted in concert,* the trial court, in ruling on the motion to strike,[22] considered whether the defendants, acting in

[21] General Statutes § 52-190a (a) provides in relevant part: "No civil action shall be filed to recover damages resulting from personal injury or wrongful death occurring on or after October 1, 1987, whether in tort or in contract, in which it is alleged that such injury or death resulted from the negligence of a health care provider, unless the attorney or party filing the action has made a reasonable inquiry as permitted by the circumstances to determine that there are grounds for a good faith belief that there has been negligence in the care or treatment of the claimant. . . ."

[22] Although the defendant in its brief used the term "motion" in the singular after having claimed that the three banks' "motions," in the plural, placed the issue before the court, we treat the term "motion" to refer to the motions filed by the banks.

concert, were negligent." We are not persuaded by the defendant's attempt to distinguish *McCarthy*.

"Pleadings have their place in our system of jurisprudence. While they are not held to the strict and artificial standard that once prevailed, we still cling to the belief, even in these iconoclastic days, that no orderly administration of justice is possible without them." *Malone* v. *Steinberg*, 138 Conn. 718, 721, 89 A.2d 213 (1952); *Moore* v. *Sergi*, 38 Conn. App. 829, 841, 664 A.2d 795 (1995). "Our rules of practice contain provisions for the framing of issues . . . ." *Thames River Recycling, Inc.* v. *Gallo*, 50 Conn. App. 767, 782, 720 A.2d 242 (1998). Our rules of practice include Practice Book § 10-39 et seq., which governs motions to strike; its proscriptions for its purpose and use are carefully set out. Given what may be the legal consequence to a party against whom such a motion is granted, the movants should be required to follow our rules of practice, especially as to the party or parties against whom it is directed. We cannot say that it is an unreasonable practice to condition the right to the remedy sought by a movant on a motion to strike on the requirement that the movant plead for that relief in a manner so that all parties directly concerned know that they are the object of such requested relief.[23]

The circumstances of this case point to the necessity of following our practice and requiring the use of a motion to strike. The defendant's motion clearly specified which counts it moved to strike as well as discussed count by count why the defendant wanted the court to strike those counts. Nowhere, however, did the defendant request that the court strike count three as to the defendant. The plaintiff, in his memorandum of law in opposition to the defendant's motion to strike, could not provide any analysis or counterargument with

---

[23] There is nothing in the record to show that at the hearing, the defendant asked the court to strike count three.

respect to count three. The court, however, intervened and struck count three. Under the circumstances, we are persuaded that it acted sua sponte.[24] We do not agree that the issue of the sufficiency of count three was properly before the court because the plaintiff had alleged in his complaint that the defendant and the banks had "acted in concert." In addition, the motion to strike, as filed and presented to the plaintiff, did not give him reasonable notice that count three could be struck. We are mindful that it is a fundamental tenet of due process that persons directly concerned with the result of an adjudication be given reasonable notice and the opportunity to present their claims or defenses. *Weil* v. *Miller*, 185 Conn. 495, 500, 441 A.2d 142 (1981). This case calls to mind the admonition that "[e]ither we adhere to the rules [of practice] or we do not adhere to them." *Osborne* v. *Osborne*, 2 Conn. App. 635, 639, 482 A.2d 77 (1984). We conclude, therefore, that the court acted improperly when, sua sponte, it struck count three.

II

We next address the plaintiff's claim that the court improperly struck count four, which alleged intentional infliction of emotional distress, because the plaintiff did not allege extreme or outrageous conduct on the part of the defendant. We conclude that the court properly determined that the plaintiff's allegations failed to meet the threshold pleading requirement of extreme and outrageous conduct, and, accordingly, properly granted the defendant's motion to strike count four.

As an initial matter, we set forth the standard of review and legal principles that guide our resolution of that issue. In determining whether a plaintiff may

[24] The term "sua sponte" is defined as "[o]f his or its own will or motion; voluntarily; without prompting or suggestion." Black's Law Dictionary (6th Ed. 1990).

maintain an action for intentional infliction of emotional distress, the plaintiff must establish four elements. "It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. . . . *Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine.* . . . Only where reasonable minds disagree does it become an issue for the jury. . . . Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society. . . .

"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous! . . . Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." (Citation omitted; emphasis added; internal quotation marks omitted.) *Carnemolla* v. *Walsh*, 75 Conn. App. 319, 331–32, 815 A.2d 1251, cert. denied, 263 Conn. 913, 821 A.2d 768 (2003); see also *Appleton* v. *Board of Education*, 254 Conn. 205, 210–11, 757 A.2d 1059 (2000); 1 Restatement (Second), Torts § 46 (1965); W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 12, p. 60. As we previously have stated, our review is plenary because the

court rendered judgment for the defendant as a matter of law.

## A

Initially, we note that the defendant in its brief claims that attorneys, as officers of the court, "have absolute immunity from liability for communications and statements made in the course of judicial proceedings," and that " '[t]his privilege extends to every step of the proceeding until the final disposition.' " Essentially, the defendant argues that this immunity bars the plaintiff's claim of intentional infliction of emotional distress. For authority, the defendant cites *Petyan* v. *Ellis*, 200 Conn. 243, 510 A.2d 1337 (1986), and *Mozzochi* v. *Beck*, 204 Conn. 490, 529 A.2d 171 (1987). The defendant argues that " 'regardless of how the . . . conduct is characterized . . . [it] was absolutely privileged, [and therefore the defendant] would not be liable for the intentional infliction of emotional harm in any event.' "

Both *Petyan* and *Mozzochi* merit further discussion vis-a-vis the context of the case before us. In *Petyan*, the plaintiff filed an action against the defendant, a family practice physician, alleging libel and intentional infliction of emotional distress. *Petyan* v. *Ellis*, supra, 200 Conn. 243. The plaintiff had applied for unemployment compensation and, as part of that process, the defendant, her former employer, had filled out a "fact-finding supplement" form provided by the state department of labor on which the defendant stated that the reasons for releasing the plaintiff were "unsatisfactory performance and, mainly for fraud and lying . . . ." Id., 245. The trial court directed a verdict for the defendant, and the plaintiff appealed. Id., 243–44. Our Supreme Court affirmed the decision, holding that because the alleged defamatory statement was made in the course of a judicial proceeding, the trial court had acted appropriately in determining that the defendant had an abso-

lute privilege to publish it and, therefore, the plaintiff could not recover for the alleged libel and intentional infliction of emotional distress. Id., 250–54.

*Petyan*, however, is distinguishable from this case. Even recognizing *Petyan*'s statement that absolute immunity "extends to every step of the proceeding until final disposition"; id., 246; it is clear that in *Petyan*, the court was confronted with a written statement that the defendant had given in a "fact-finding supplement" form sent to the state department of labor. That does not necessarily mandate the course to be followed in this case, especially because the plaintiff argues that some of the allegations in count four are based on nonverbal conduct that occurred outside the scope of judicial proceedings. An examination of the allegations set forth in count four would indicate that that is a fair statement.

Turning to *Mozzochi*, "[t]he principal issue in [that] case [was] whether a cause of action for abuse of process may be brought to recover damages from attorneys who allegedly pursued litigation despite their discovery that their client's claim lacked merit." *Mozzochi* v. *Beck*, supra, 204 Conn. 491. The trial court granted the defendant's motion to strike the complaint, and the plaintiff appealed. Id.

Our Supreme Court discussed the scope of the potential liability of an attorney for abuse of process arising out of the attorney's professional responsibility to clients, which must be reconciled with the court's "responsibility to assure unfettered access to our courts." Id., 494. It stated that in doing so, "we have afforded to attorneys, as officers of the court, absolute immunity from liability for allegedly defamatory communications in the course of judicial proceedings." Id., 494–95. Immediately thereafter, however, the court stated: *"For other causes of action, however, the exigencies of the adversary system have not been deemed to require*

*absolute immunity for attorneys.* We have assumed, without discussion, that an attorney may be sued in an action for vexatious litigation, arguably because that cause of action has built-in restraints that minimize the risk of inappropriate litigation." (Emphasis added.) Id., 495; see also 3 Restatement (Second), Torts § 586 (1977) ("[a]n attorney at law is absolutely privileged to publish defamatory matter concerning another communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding").

It appears that if the doctrine of absolute immunity simply barred the plaintiff from submitting his complaint, that would clash with our policy "to give to a party who claims to have suffered a wrong at the hands of another every reasonable opportunity to establish his right to redress." *Gesualdi* v. *Connecticut Co.*, 131 Conn. 622, 631, 41 A.2d 771 (1945); *Licata* v. *Spector*, 26 Conn. Sup. 378, 382, 225 A.2d 28 (1966). Such a policy recognizes that "[a]n attorney must conduct himself or herself in a manner that comports with the proper functioning of the judicial system." *In the Matter of Presnick*, 19 Conn. App. 340, 345, 563 A.2d 299, cert. denied, 213 Conn. 801, 567 A.2d 833 (1989).

We conclude that the absolute immunity doctrine, as it is characterized by the defendant, does not, as a threshold matter, prevent the plaintiff from bringing this particular cause of action in count four of his complaint.[25] Instead, we must examine the factual allega-

---

[25] We note that nowhere in its motion to strike did the defendant make any claim of absolute immunity. In addition, we also note that the only place in its memorandum of decision that the court referred to "absolute immunity" is in its comment striking count five, in which the court stated: "[C]ount [five] alleging libel against the defendants is insufficient because it is long established that there is an absolute privilege for *statements* made in judicial proceedings. *Petyan* v. *Ellis*, [supra, 200 Conn. 245]."

tions set forth in count four and determine if they contain statements made during the judicial proceedings that were, therefore, entitled to immunity or if they pertain to matters outside the scope of the judicial proceedings. If the latter is the case, we must then determine whether those allegations constitute the basis for an actionable claim of the tort of intentional infliction of emotional distress. As we will set forth in greater detail, the plaintiff has made certain allegations that are not protected by immunity, but do not meet the requirement of extreme and outrageous conduct to survive the defendant's motion to strike.

## B

The plaintiff alleged that the attorney for the defendant, on the record, blamed the plaintiff for causing the delay in the case. That appears to be a statement made during a judicial proceeding and, therefore, would be protected under *Petyan* and *Mozzochi*. The other facts alleged in count four are as follows: (1) the banks, through the defendant, filed an action without having the title to the mortgage and note; (2) the defendants refused attempts to resolve the matter and ignored the plaintiff, causing the debt to increase by $20,000; (3) the defendant withheld certain documents that the plaintiff was entitled to until ordered by the court to turn them over; (4) the defendant told the plaintiff that the delay was his fault; (5) the defendants refused to litigate the motion for a deficiency judgment, which had been filed without any intention to prosecute it and against the advice of the court, either to punish the plaintiff or to force him to remain in the state; (6) the defendant sent the plaintiff a letter that contained several falsehoods; (7) the defendant refused to withdraw the motion for a deficiency judgment after it was dismissed by the court, thereby requiring the plaintiff to remain in the state for an additional four months in case the defen-

dants attempted to open the judgment; and (8) the plaintiff was required to go to court on numerous occasions.

The issue before us, therefore, is whether those allegations, not entitled to the protection of immunity, could cause reasonable minds to differ as to whether they constituted extreme and outrageous conduct, that is, whether they exceed all bounds tolerated by a decent society, the second element of a cause of action for intentional infliction of emotional distress. We conclude that they do not.

At the outset, we recognize that we must not adopt rules that will have a chilling and inhibiting effect on would be litigants of justiciable issues. *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, 64 Conn. App. 192, 199–200, 779 A.2d 822 (2001), rev'd in part on other grounds, 260 Conn. 766, 802 A.2d 44 (2002).

We are unaware of any appellate decision in this state addressing the issue of whether the filing of an action can form the basis of a claim of intentional infliction of emotional distress.[26] On several occasions, however, both our Supreme Court and this court have stated that "[t]he mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." (Internal quotation marks omitted.) *Parsons* v. *United Technologies Corp.*, 243 Conn. 66, 89, 700 A.2d 655 (1997); *Campbell* v. *Plymouth*, 74 Conn.

---

[26] The Supreme Court of Maine has expressly held: "We have previously noted that a party cannot be liable for intentional infliction of emotional distress for insisting on his or her rights in a permissible manner. . . . We are not prepared to recognize that the tort of intentional infliction of emotional distress is available to a party outraged by the filing of a lawsuit against it. If a lawsuit has been initiated without a legitimate basis and has terminated unsuccessfully, then the tort of malicious prosecution may be invoked for redress." (Citations omitted.) *Davis* v. *Currier*, 704 A.2d 1207, 1209 (Me. 1997). On the basis of the facts and circumstances of this case, it is not necessary for us to determine whether the filing of an action can form the basis for a claim of intentional infliction of emotional distress.

App. 67, 78, 811 A.2d 243 (2002); *Muniz* v. *Kravis*, 59 Conn. App. 704, 710, 757 A.2d 1207 (2000). An analogy can be drawn between those cases, in which employees had their employment terminated on the basis of wrongful motivations, and the present case, in which the defendant allegedly filed an action against the plaintiff for an improper reason. The act of filing a lawsuit, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior or make the average member of the community raise their hand and exclaim, "Outrageous!"

Although we do not endorse the conduct alleged in the plaintiff's complaint, and such conduct may have been stressful or hurtful to the plaintiff, we cannot conclude that reasonable minds could find such conduct extreme or outrageous. The court, therefore, properly struck count four of the plaintiff's complaint.

IV

Finally, we address count nine,[27] which alleged a violation of 15 U.S.C. § 1692 et seq., known as the Fair Debt Collection Practices Act (act).[28]

The plaintiff claims that the only issue on appeal is whether the court improperly struck count nine because he failed to allege harassing, abusive or unfair practices or any other specific violation in charging that the defendant had violated the act. The defendant argues that the court acted appropriately by striking count nine for the reasons we will discuss. In addition, however, the defendant argues that the court improperly failed to find that the plaintiff's claim was barred

[27] Count nine contains thirty-one paragraphs of allegations, some of which are newly alleged in that count and others that are incorporated by reference from other counts.

[28] Section 1692e of title 15 of the United States Code provides in relevant part that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. . . ."

by the applicable statute of limitations, i.e., it was not commenced within one year of the alleged violation. See 15 U.S.C. § 1692k (d). We conclude that the court improperly struck count nine.

## A

Preliminarily, we address the statute of limitations matter raised by the defendant.[29] In the second paragraph of its discussion of count nine in its memorandum of decision, the court stated: "Furthermore, it is obvious that the one year statute of limitations under the statute bars any claim by the plaintiff under this act, since this action was commenced in February, 2001, and the most recent improper action by the [defendant] alleged by the plaintiff took place in June, 1999."

The plaintiff took issue with that conclusion and filed a "motion to reargue motion to strike and objection." In the motion, the plaintiff claimed, inter alia, that the court had made a mistake in its decision as to the date on which the plaintiff commenced his action. A hearing was held, and the court decided that the action had been brought within the one year statute of limitations. Accordingly, by order dated December 19, 2001, the court stated that it "deletes the second paragraph in paragraph nine, relating to the statute of limitations, in the memorandum of decision, dated August 15, 2001, but otherwise denies this motion to reargue."[30]

In pressing its claim on the limitations issue, the defendant argues that the plaintiff's claim is barred by

[29] The plaintiff argues that the issue is not before this court because it was resolved by the trial court in his favor, and the defendant failed to file a cross appeal. We believe that the issue is before us properly because the record indicates that the defendant raised the issue of the statute of limitations as an alternate ground on which to sustain the judgment on count nine. See Practice Book § 63-4 (a) (1) (A).

[30] Although at a later proceeding, some of the earlier conduct might arguably fall outside the one year limitation period, that does not, in our view, prevent the consideration of conduct that does fall within the one year limitation period.

the governing federal statute of limitations. Specifically, it refers to 15 U.S.C. § 1692k (d), which provides in relevant part that "[a]n action to enforce any liability created by this [act] may be brought in any appropriate United States district court . . . or in any other court of competent jurisdiction, *within one year from the date on which the violation occurs*." (Emphasis added.) The defendant argues that when the limitations period is contained in the statute that creates a cause of action that did not exist at common law and there is a failure to comply with that limitations period, a substantive and jurisdictional prerequisite, the remedy exists only during the prescribed period and not thereafter. See *Avon Meadow Condominium Assn., Inc.* v. *Bank of Boston Connecticut*, 50 Conn. App. 688, 699–700, 719 A.2d 66, cert. denied, 247 Conn. 946, 723 A.2d 320 (1998). That appears to be the law with respect to such Connecticut statutes.

Because the act is a federal law, we turn to the federal courts[31] to see if the Connecticut doctrine regarding the

---

[31] The parties have suggested, at oral argument and in their briefs, that Connecticut has an equivalent statute. Our research has not revealed any such statute that might provide us with guidance. In *Krutchkoff* v. *Fleet Bank, N.A.*, 960 F. Sup. 541, 547–48 (D. Conn. 1996), the District Court addressed whether General Statutes §§ 36a-645, 36a-646 and 36a-347 mirrored the act. The court found that there were two critical distinctions between the federal and state statutes. *Krutchkoff* v. *Fleet Bank, N.A.*, supra, 548. First, the act provides for a private cause of action; the state statutory scheme, however, conveys the power solely to the state banking commission. Id. Second, the act applies to debt collectors while the state statutes apply to creditors. Id. The act defines a debt collector as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. . . ." 15 U.S.C. § 1692a (6). The District Court stated that the federal act "explicitly excludes from the definition of 'debt collector' any person collecting a debt which was originated by such person. *Krutchkoff* v. *Fleet Bank, N.A.*, supra, 548.

It does not appear, therefore, that a state statute equivalent to the act exists.

statute of limitations applies there. It would appear that it does not. In *Central States, Southeast & Southwest Areas Pension Fund* v. *Navco*, 3 F.3d 167, 169 (7th Cir. 1993), cert. denied, 510 U.S. 1115, 114 S. Ct. 1062, 127 L. Ed. 2d 382 (1994), the United States Court of Appeals for the Seventh Circuit, in addressing the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1381 et seq. (MPPAA), discussed whether federal statutes were jurisdictional. The District Court had concluded that the statute of limitations contained in § 1381 was jurisdictional. The Seventh Circuit disagreed: "[The District Court] concluded that tolling is unavailable because the time limit is jurisdictional. [It] understood *Smith* v. *Chicago Heights*, 951 F.2d 834, 838 (7th Cir. 1992), to establish the principle that statutes of limitations applicable to claims unknown to the common law are jurisdictional and hence not subject to tolling or estoppel. *The portion of Smith that contains this discussion dealt with Illinois law. There is no comparable rule when a federal statute supplies the period of limitations. To the contrary, periods of limitations in federal statutes—almost all of which establish rights unknown to the common law—are universally regarded as non-jurisdictional.*" (Emphasis added; internal quotation marks omitted.) *Central States, Southeast & Southwest Areas Pension Fund* v. *Navco*, supra, 173. The court's holding, however, was limited to the MPPAA. Id.

In *Marshall-Mosby* v. *Corporate Receivables, Inc.*, 205 F.3d 323 (7th Cir. 2000), the defendant, for the first time on appeal, raised the issue of whether the plaintiff's claims under the act were barred by the statute of limitations. That case presented the issue, therefore, of whether the act's statute of limitations was jurisdictional. The Seventh Circuit held that it was not. "Despite [the defendant's] contrary assertions, the statute of limitations provision in the [act] is not a jurisdictional

restriction. . . . As such, [the defendant] cannot raise on appeal its statute of limitations defense, nor can we review it *sua sponte*." (Emphasis in original.) Id., 327.

Thus, it appears that the defendant's claim that the act's statute of limitations concerns subject matter jurisdiction is without merit.

## B

We must now determine if the plaintiff alleged facts that would sustain a cause of action under the act. In *Russell* v. *Equifax A.R.S.*, 74 F.3d 30 (2d Cir. 1996), the United States Court of Appeals for the Second Circuit provided a brief but instructive overview of the purpose and history of the act. In *Russell*, the court stated: "What happens to a consumer who is unable to pay her creditors has changed greatly from those days when a debtor like Wilkins Micawber was sent to King's Bench Prison because he had no money or property available to pay his debts. See Charles Dickens, David Copperfield (Part One) 201 (Peter Fenelon Collier & Son ed. 1900). While debt collectors are, of course, charged with the duty of collecting debts that are owed, they may not do so today in a manner that prevents consumers from exercising their legal rights. In enacting the [act] Congress pointed out that [m]eans other than misrepresentation or other abusive debt collection practices are available for the effective collection of debts. 15 U.S.C. § 1692 (c). As a consequence of its concern, the legislature armed consumers with a shield against the overly zealous debt collector; this shield is particularly important in our modern computer-driven world." (Emphasis in original; internal quotation marks omitted.) *Russell* v. *Equifax A.R.S.*, supra, 32.

The court continued its history of the act: "Before entering a discussion of the merits of those issues, it is helpful to trace a brief outline of the most salient features of the [act]. The [act], consisting of 16 succinct

sections, is based on Congress' findings that debt collection abuses are serious and widespread, and a finding by the National Commission on Consumer Finance, referred to in the legislative history, which showed that the vast majority of consumers who obtain credit fully intend to repay their debts. S. Rep. No. 95-382, 95th Cong., 1st Sess. 3 (1977), reprinted in 1977 U.S.C.C.A.N. 1695, 1697 (Legis. History). Congress explained that although unscrupulous collectors comprise only a small portion of the industry, the less ethical debt collectors threaten consumers with violence, use profane or obscene language, make telephone calls at unreasonable hours, impersonate public officials and lawyers, disclose debtors' personal affairs to employers and engage in other sorts of unscrupulous practices. . . .

"The [a]ct's purpose is to eliminate such practices. See § 1692 (e); Legis. History at 1696. Some enumerated actions—for example, threats of violence and repeated telephone calls intended to harass—are expressly forbidden. § 1692d. *The [a]ct also bars the general use of any false, deceptive, or misleading representation or means in connection with the collection of any debt.* § 1692e. Section 1692e, without limiting the general applicability of the bar against false and deceptive methods of debt collecting, then sets forth in 16 subdivisions specific examples of false, deceitful or misleading conduct that violates the [a]ct.

"Further, a debt collector violating the [a]ct is liable for actual damages, plus costs and reasonable attorney's fees, as well as any other damages not exceeding $1,000 found appropriate by a trial court. See § 1692k (a). Because the [a]ct imposes strict liability, a consumer need not show intentional conduct by the debt collector to be entitled to damages. However, a debt collector may escape liability if it can demonstrate by a preponderance of the evidence that its violation [of the act] was not intentional and resulted from a bona

fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error. § 1692k (c)." (Citation omitted; emphasis added; internal quotation marks omitted.) *Russell* v. *Equifax A.R.S.*, supra, 74 F.3d 33–34; see also *Kropelnicki* v. *Siegel*, 290 F.3d 118, 127–28 (2d Cir. 2002).

Important to the present case is the fact that the act prohibits "debt collectors from using 'any false, deceptive, or misleading representation or means in connection with the collection of any debt.' § 1692e. An example of such illegal conduct is the 'use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.' § 1692e (10)." *Russell* v. *Equifax A.R.S.*, supra, 74 F.3d 34.

In count nine, the plaintiff alleged that the defendant, on April 19, 1999, refused to turn over certain documents until ordered to do so by the court and issued a written statement with an incorrect time regarding a court appearance. Further, he alleged that the defendant had filed a motion for a deficiency judgment, but never intended to follow through with the motion. The plaintiff also claimed that after the defendant failed to attend a hearing on the motion for a deficiency judgment, the defendant attempted to induce him to leave the state so that it could proceed unopposed. The complaint finally alleged that the defendant had sent the plaintiff a letter that contained several falsehoods.[32]

---

[32] The plaintiff alleged in his complaint that the letter written by the defendant contained the following false statements: "a. The Court had not warned against seeking a deficiency judgment and that the said motion seeking one was filed just to protect the lenders' rights;

"b. The [defendant] has instructions to not pursue the motion but might do so if [the] Plaintiff won the Connecticut Lottery, although [the defendant and the banks] knew that a judgment is good for twenty years;

"c. That Plaintiff's [o]bjection to [d]eficiency [j]udgment, filed in June, 1999, would protect him if [the defendant and the banks] did decide to go forward, but knowing full well that [the] Plaintiff wanted to leave Connecticut and would not be around to argue same or even receive notice of any hearings for that;

On the basis of the foregoing, it appears that some or all of those allegations constitute false, deceptive, abusive or misleading actions that are connected to the action. The defendant was served with the writ of summons on April 11, 2000. The act has a one year statute of limitations. Because some of the allegations set forth in the complaint occurred after April 11, 1999,[33] the statute of limitations has been satisfied.[34] Accordingly, the court acted improperly when it struck count nine.

The judgment is affirmed as to the dismissal of count four of the plaintiff's complaint; the judgment is reversed as to the dismissal of counts three and nine; and the case is remanded for further proceedings consistent with this opinion.

In this opinion the other judges concurred.

"d. The [m]otion for [d]eficiency [j]udgment would eventually be dismissed under the case dormancy program, knowing that such post-foreclosure motions never come under that program;

"e. [The defendant and the banks] wanted to know if their position were acceptable to the Plaintiff when they already knew full well that it was not."

[33] In his supplemental motion to reargue, the plaintiff claims that he commenced the action on March 10, 2000. The writ is dated March 10, 2000, but was not served on the defendant until April 11, 2000. See *Rana* v. *Ritacco*, 236 Conn. 330, 338, 672 A.2d 946 (1996).

[34] The complaint alleged that the motion for a deficiency judgment was filed on or about May 20, 1999, and that the letter from the defendant was dated June 23, 1999.