## FALLS CHURCH GROUP, LTD. *v.* TYLER, COOPER AND ALCORN, LLP
### (AC 24924)

Bishop, DiPentima and Gruendel, Js.

Argued February 7—officially released June 7, 2005

*Michael J. Walsh*, with whom were *Karolina A. Dowd* and, on the brief, *Ann Walsh Henderson*, for the appellant (plaintiff).

*Patrick M. Noonan*, for the appellee (defendant).

*Opinion*

GRUENDEL, J. In this vexatious litigation action, the plaintiff, Falls Church Group, Ltd. (Falls Church), appeals from the judgment of the trial court rendered in favor of the defendant, the law firm of Tyler, Cooper & Alcorn, LLP (law firm). On appeal, Falls Church claims that the court improperly (1) bifurcated the trial into separate phases and (2) concluded that Falls Church failed to prove that the law firm lacked probable cause to initiate the underlying action. We disagree with both claims and affirm the judgment of the trial court.

The following facts and procedural history are relevant to Falls Church's appeal. On March 1, 1988, Retirement Centers of America, Inc. (Retirement Centers), entered into a consulting agreement and a project management agreement with East Hill Woods, Inc. (East Hill Woods), to provide consulting and marketing services to East Hill Woods in connection with the development of a continuing care retirement community in Southbury. As compensation for its services, Retirement Centers was to receive a consulting fee, which East Hill Woods would disburse in portions at different phases of the retirement community's development.

Retirement Centers had among its marketing objectives the encouragement of prospective residents to enter into residence agreements. Under those agreements, an entry fee, which ranged from $117,000 to more than $300,000, entitled residents to lifetime use of their living unit and unlimited nursing care if they could no longer live independently. When residents left the community, died or sold their units, they or their

estates would, subject to certain conditions and exceptions, receive a refund of 94 percent of the entrance fee. Upon execution of the agreements, residents were required to pay a deposit of 5 percent of the entrance fee, $200 of which was nonrefundable if they chose ultimately not to move into the community.

The first residence agreement was signed on July 7, 1988, approximately thirteen months before East Hill Woods commenced construction of the retirement community. The last residence agreement during Retirement Centers' tenure as East Hill Wood's marketing consultant was executed in December, 1990. Shortly thereafter, Retirement Centers and East Hill Woods entered into a settlement agreement, effective January 18, 1991, terminating Retirement Centers' role in the project. Under that agreement, East Hill Woods was to pay Retirement Centers $222,403 when residents occupied 85 percent of the community's living units and $192,000 pursuant to a promissory note payable at the rate of $6000 per month for thirty-four months. As of the settlement agreement's effective date, the retirement community remained unoccupied. It was not until April, 1991, that the first resident moved into the community.

Six years later, financial difficulties forced East Hill Woods into bankruptcy, which compromised the right of residents to receive their refund of 94 percent of the entrance fee. The next year, on January 7, 1998, the law firm commenced the underlying action by filing a complaint on behalf of 177 plaintiffs (residents, former residents or their estates) against several defendants, including Retirement Centers. The counts directed toward Retirement Centers were made on behalf of fifty-three plaintiffs who had signed residence agreements before the effective date of Retirement Centers' settlement agreement with East Hill Woods. Although those counts present different factual theories, each one stems from Retirement Centers' alleged

failure to satisfy its statutory disclosure duty under General Statutes § 17b-529,[1] the statute that creates a cause of action in favor of any person contracting with a continuing care facility who, before signing the contract, is provided either with a misleading disclosure statement or not provided with a disclosure statement at all. On May 4, 1998, Falls Church, Retirement Centers' successor in interest, was substituted as a defendant by stipulation of the parties.

When the law firm initiated the underlying action, it was fully cognizant that the statutes of limitation had run on the plaintiffs' claims against Falls Church. Indeed, before the law firm filed the complaint in that action, it had undertaken to induce the legislature to modify the limitations period set forth in § 17b-529. The law firm sought to enlarge the limitations period in § 17b-529 from six to seven years and to change the date on which the limitations period would begin to run, from the date the residence agreement was signed to the date the resident moved into the facility. Its legislative efforts ultimately proved unsuccessful.

---

[1] General Statutes § 17b-529 (a) provides: "Any person who as, or on behalf of, a provider, enters into a contract for continuing care at a facility without having first delivered a disclosure statement meeting the requirements of section 17b-522 to the person contracting for the continuing care, or enters into a contract for continuing care at a facility with a person who has relied on a disclosure statement that omits to state a material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they are made, not misleading, is liable to the person contracting for the continuing care for damages and repayment of all fees paid to the provider, facility or person, less the reasonable value of care and lodging provided to the resident by or on whose behalf the contract for continuing care was entered into prior to discovery of the violation, misstatement or omission or to the time the violation, misstatement or omission should reasonably have been discovered, together with interest thereon at the legal rate for judgments, and court costs and reasonable attorneys fees. An action to enforce liability pursuant to this section shall not be maintained unless brought within six years after the execution of the contract for continuing care giving rise to the liability."

On September 8, 1998, Falls Church filed a motion for summary judgment, arguing that the plaintiffs' claims were barred by the applicable statutes of limitation. The law firm filed an objection, asserting various tolling arguments. The court, *Hodgson, J.*, rejected the law firm's attempts to evade the statutes of limitation and rendered summary judgment in favor of Falls Church on all counts.

Falls Church then brought the vexatious litigation action that is the subject of this appeal. Falls Church asserted claims for both common-law and statutory vexatious litigation in its complaint, the thrust of which was that the law firm instituted the underlying action without probable cause and with malice because it knew that Retirement Centers had ended its involvement with East Hill Woods in January, 1991—seven years before the law firm initiated the action—and that it knew, or should have known, that all of the plaintiffs' claims were barred by statutes of limitation.

The law firm filed a motion to bifurcate the probable cause issue from the issues of malice and damages. The court, *Berger, J.*, granted the motion and conducted a multiday evidentiary hearing, after which it issued a thirty-seven page memorandum of decision. In its decision, the court discussed, in detail, the evidence submitted at the hearing, stating, inter alia, that East Hill Woods was created by Retirement Centers, had its board and officer ranks stacked with employees of Retirement Centers, but did not have a single employee of its own until 1991; that employees of Retirement Centers had signed the project management and consulting agreements *on behalf of East Hill Woods*; that those agreements, which listed Retirement Centers' myriad duties, attested to Retirement Centers' clear understanding and control of the retirement community's development; that employees of Retirement Centers required the plaintiffs in the underlying action, individu-

als in their 80s and 90s, who were called "clients," to complete a confidential data application that asked them to list assets, income, health problems or conditions, etc.; and that the plaintiffs received disclosure statements that contained misleading information about the retirement community's financial well-being.

The court then addressed whether it was reasonable for the law firm to believe that sufficient factual evidence existed to support a tolling of the statutes of limitation on the basis of the following tolling doctrines and related arguments: (1) fraudulent concealment, (2) continuing course of conduct, (3) aiding and abetting, (4) equitable estoppel, (5) General Statutes § 52-590[2] and (6) the law firm's effort to persuade the legislature to modify § 17b-529. The court concluded that the law firm had probable cause to rely on three of its tolling arguments (i.e., fraudulent concealment, continuing course of conduct, and aiding and abetting) and ruled, therefore, that Falls Church failed to prove that the law firm lacked probable cause to initiate the underlying action. This appeal followed. Additional facts will be set forth as necessary.

I

Falls Church claims that the court improperly bifurcated the trial into separate phases.[3] Specifically, it

[2] General Statutes § 52-590 provides: "In computing the time limited in the period of limitation prescribed under any provision of chapter 925 or this chapter, the time during which the party, against whom there may be any such cause of action, is without this state shall be excluded from the computation, except that the time so excluded shall not exceed seven years."

[3] "Pursuant to General Statutes § 52-205 and Practice Book § 15-1, the trial court may order that one or more issues that are joined be tried before the others. The interests served by bifurcated trials are convenience, negation of prejudice and judicial efficiency. . . . Bifurcation may be appropriate in cases in which litigation of one issue may obviate the need to litigate another issue. . . . The bifurcation of trial proceedings lies solely within the discretion of the trial court." (Citation omitted; internal quotation marks omitted.) *Barry* v. *Quality Steel Products, Inc.*, 263 Conn. 424, 448–49, 820 A.2d 258 (2003).

argues that, in bifurcating the probable cause issue from the issues of malice and damages, the court deprived Falls Church of its constitutional right to have a jury decide all of the factual issues relating to the existence of probable cause. We reject that argument because it cannot be reconciled with Falls Church's position before the trial court.

At the hearing on the law firm's motion for bifurcation, the court discussed with counsel for the law firm the respective roles of judge and jury in determining the existence of probable cause. The court noted, and counsel for the law firm agreed, that "assuming there are material facts . . . the sole purpose of the jury would be to answer a series of interrogatories" and that "after that series of interrogatories . . . the court in determining probable cause is bound by those material facts . . . . " At that point, counsel for Falls Church asserted that if the court were to grant the motion for bifurcation, it—not a jury—should decide the issues of fact. Specifically, he stated: "Obviously, I have an objection to the motion to bifurcate. I'll put that on the record. Assuming we get to the next step, and let's say Your Honor does decide to bifurcate just the issue of probable cause, how would we play it out? *I, personally, at that juncture would be willing . . . to agree [to] just have the facts and the law decided by Your Honor. I think it would be, quite candidly, it's workable."* (Emphasis added.) In so doing, Falls Church expressly waived the very claim it now pursues, namely, that the court deprived Falls Church of its constitutional right to have a jury decide all of the factual issues relating to the existence of probable cause. See *State* v. *Ruffin*, 48 Conn. App. 504, 510, 710 A.2d 1381 ("[o]ur procedure does not allow a [party] to pursue one course of action at trial and later, on appeal, argue that the path [it] rejected should now be open to [it]"), cert. denied, 245 Conn. 910, 718 A.2d 18 (1998); see also *State* v. *Tyson*, 86

Conn. App. 607, 613, 862 A.2d 363 (2004) ("Connecticut courts have consistently held that when a party fails to raise in the trial court the constitutional claim presented on appeal and affirmatively acquiesces to the trial court's order, that party waives any such claim"), cert. denied, 273 Conn. 927, 873 A.2d 1000 (2005). To conclude otherwise "would result in trial by ambuscade of the trial judge." *State* v. *Ruffin*, supra, 510.

## II

Falls Church next claims that the court improperly concluded that it failed to prove that the law firm lacked probable cause to initiate the underlying action. We disagree.

"A vexatious suit is a type of malicious prosecution action, differing principally in that it is based upon a prior civil action, whereas a malicious prosecution suit ordinarily implies a prior criminal complaint." *Vandersluis* v. *Weil*, 176 Conn. 353, 356, 407 A.2d 982 (1978). Vexatious suit is "the appellation given in this State to the cause of action created by statute (General Statutes § 6148 [now General Statutes § 52-568])[4] for the malicious prosecution of a civil suit . . . which we have said was governed by the same general principles as the common-law action of malicious prosecution." *Schaefer* v. *O.K. Tool Co.*, 110 Conn. 528, 534, 148 A. 330 (1930); see also *Norse Systems, Inc.* v. *Tingley Systems, Inc.*, 49 Conn. App. 582, 596, 715 A.2d 807 (1998) ("[t]he elements of a common-law or statutory cause of action for vexatious litigation are identical").

To establish a cause of action for vexatious suit, a plaintiff must prove, inter alia, that a prior suit was

---

[4] General Statutes § 52-568 provides: "Any person who commences and prosecutes any civil action or complaint against another, in his own name or the name of others, or asserts a defense to any civil action or complaint commenced and prosecuted by another (1) without probable cause, shall pay such other person double damages, or (2) without probable cause, and with a malicious intent unjustly to vex and trouble such other person, shall pay him treble damages."

brought without probable cause. See General Statutes § 52-568; *DeLaurentis* v. *New Haven,* 220 Conn. 225, 248, 597 A.2d 807 (1991). "Lack of probable cause for institution of the original proceedings is the very gist of the action for [vexatious litigation] . . . ." 30 Am. Jur. 2d Proof of Facts, p. 226 (1982). "The existence of probable cause is an absolute protection . . . and what facts, and whether particular facts, constitute probable cause is always a question of law." (Internal quotation marks omitted.) *Vandersluis* v. *Weil,* supra, 176 Conn. 356. As such, our review is plenary. See *Ancona* v. *Manafort Bros., Inc.,* 56 Conn. App. 701, 708, 746 A.2d 184, cert. denied, 252 Conn. 953, 749 A.2d 1202 (2000).

"Both attorney and [litigant] must act with probable cause in prosecuting a civil action . . . ." 30 Am. Jur. 2d, Proof of Facts, supra, p. 227. Although our Supreme Court has developed a standard of probable cause with respect to a litigant's decision to file a lawsuit; see, e.g., *DeLaurentis* v. *New Haven,* supra, 220 Conn. 256 ("[p]robable cause is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of" [internal quotation marks omitted]); neither it nor we have done so with respect to an attorney's decision to file a lawsuit on a litigant's behalf. See *Mozzochi* v. *Beck,* 204 Conn. 490, 495, 529 A.2d 171 (1987) ("assum[ing], *without discussion,* that an attorney may be sued in an action for vexatious litigation" [emphasis added]);[5] *Heim* v.

---

[5] In *Mozzochi* v. *Beck,* supra, 204 Conn. 495, the court addressed whether "an attorney may be sued for misconduct by those who have sustained a special injury because of an unauthorized use of legal process." It concluded that such an action could be brought against an attorney, but noted that "[i]n permitting such a cause of action, we must . . . take care not to adopt rules which will have a chilling and inhibitory effect on would-be litigants of justiciable issues." (Internal quotation marks omitted.) Id. It sought, therefore, to avoid any rule that would "interfere with the attorney's primary duty of robust representation of the interests of his or her client." Id., 497.

*California Federal Bank*, 78 Conn. App. 351, 368, 828 A.2d 129 (same), cert. denied, 266 Conn. 911, 832 A.2d 70 (2003). Given the special considerations "to be applied in determining the liability of an attorney sued for [vexatious litigation]"; 30 Am. Jur. 2d, Proof of Facts, supra, p. 228; other jurisdictions have found it necessary to articulate a standard of probable cause applicable to vexatious litigation actions against attorneys. See, e.g., *Wilson* v. *Hayes*, 464 N.W.2d 250, 259 (Iowa 1990) ("[w]hile we have addressed the question of probable cause to file suit from a litigant's standpoint, we have not developed a standard for reviewing an attorney's decision to file suit"); *Wong* v. *Tabor*, 422 N.E.2d 1279, 1285 (Ind. App. 1981) ("[w]hile Indiana courts have frequently addressed the question of probable cause to file suit from a litigant's perspective, we have not developed a standard for reviewing a lawyer's decision to bring suit"). We also find it necessary to do so. In the absence of decisions from either this court or our Supreme Court, we look to the decisions of courts in other jurisdictions that have developed standards of probable cause applicable to vexatious litigation actions against attorneys.

We start with a discussion of the competing policy considerations, namely, "the need to ensure open access to the courts and vigorous representation by counsel on the one hand, and on the other hand the desire to provide a remedy for every wrong and protect both the individuals sued and the judicial system from harm done by unmeritorious, vexatious lawsuits . . . ." Annot., 46 A.L.R.4th 249, 256 (1986). "[T]he prevailing judicial attitude [is] that . . . greater weight should be accorded the former considerations."[6] Id.

---

[6] Hence, the following admonition: "Counsel should . . . be aware that despite the increasing frequency with which resort is had to a malicious prosecution suit, it has been noted that few plaintiffs have been successful in malicious prosecution actions against their former adversary's attorneys." Annot., 46 A.L.R.4th, supra, 256.

That attitude was aptly expressed by the Indiana Court of Appeals in *Wong* v. *Tabor,* supra, 422 N.E.2d 1279: "[W]e must be ever mindful that an attorney's role is to facilitate access to our judicial system for any person seeking legal relief. As such, probable cause is not to be judged merely upon some personal assessment of a claim's merit. It must encompass consideration of the law's desire to fully meet the client's needs. While an attorney is under an ethical duty to avoid suit where its only purpose is to harass or injure, *if a balance must be struck between the desire of an adversary to be free from unwarranted accusations and the need of the client for undivided loyalty, the client's interests must be paramount.* . . . [T]he very nature of our adversary system of law mandates that the most useful and meaningful tests in this area must be derived from an attorney's ethical and professional obligations to his client. . . .

"We thus emphasize that any standard of probable cause must insure that the attorney's duty to his client to present his case vigorously in a manner as favorable to the client as the rules of law and professional ethics will permit is preserved. . . . Mere negligence in asserting a claim is not sufficient to subject an attorney to liability for the bringing of suit. As [one] court . . . astutely observed, [t]o create liability only for negligence, for the bringing of a weak case, would be to destroy his efficacy as advocate of his client and his value to the court, since only the rare attorney would have the courage to take other than the easy case. . . .

"We recognize that through an effort to protect every citizen's free access to the courts some innocent persons may suffer the publicity, expense and other burdens of defending ill-founded lawsuits. While this is regrettable, the chilling effect that a broad rule of attorney liability would have upon the legal system, and ultimately upon its popular acceptance as a means of

dispute resolution, appears to outweigh the value of the protection it would afford to those who might be deemed innocent defendants." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 1285–86.

There is a division of authority as to whether, in order to maintain the appropriate balance between the competing policy considerations, the existence of probable cause in a vexatious litigation action against an attorney should be judged by an objective standard or a standard comprising both objective and subjective parts. Compare, e.g., *Sheldon Appel Co.* v. *Albert & Oliker*, 47 Cal. 3d 863, 877–82, 765 P.2d 498, 254 Cal. Rptr. 336 (1989) (en banc) (objective), with *Wong* v. *Tabor*, supra, 422 N.E.2d 1287–88 (objective and subjective). The court in *Wong* adopted the latter standard as set forth by the California Court of Appeals in *Tool Research & Engineering Corp.* v. *Henigson*, 46 Cal. App. 3d. 675, 683, 120 Cal. Rptr. 291 (1975), overruled, *Sheldon Appel Co.* v. *Albert & Oliker*, 47 Cal. 3d 863, 883, 765 P.2d 498, 254 Cal. Rptr. 336 (1989) (en banc), a standard that was, according to the Indiana Court of Appeals, "[t]he most frequently quoted judicial standard . . . ." *Wong* v. *Tabor*, supra, 1287. Under that standard, "[a]n attorney has probable cause to represent a client in litigation when, after a reasonable investigation and industrious search of legal authority, he has an honest belief that his client's claim is tenable in the forum in which it is to be tried. . . . The test is twofold. The attorney must entertain a subjective belief in that the claim merits litigation and that belief must satisfy an objective standard." (Internal quotation marks omitted.) Id. Clarifying the levels of inquiry, the court in *Wong* stated that the objective standard adopted is "whether the claim merits litigation against the defendant in question on the basis of the facts known to the attorney when suit is commenced"; id., 1288; a "question

. . . answered by determining that no competent and reasonable attorney familiar with the law of the forum would consider that the claim was worthy of litigation on the basis of the facts known by the attorney who instituted suit." Id. Before answering that question, the court explained, it must be determined whether the attorney subjectively believed that the claim was worthy of litigation. Id.

In *Sheldon Appel Co.* v. *Albert & Oliker*, supra, 47 Cal. 3d 878, the California Supreme Court expressly rejected the *Tool Research & Engineering Corp.* standard of probable cause, explaining that it was flawed in two respects. First, the standard in *Tool Research & Engineering Corp.* of "subjective belief" fundamentally alters the probable cause element because even if the court determines that the underlying lawsuit objectively was reasonable, it cannot terminate the action in the defendant's favor as long as there is any evidence raising a question as to the defendant's subjective belief in the tenability of the claim. Id., 878–79. "And because the issue of an attorney's subjective belief or nonbelief in legal tenability would rarely be susceptible of clear proof and, when controverted, would always pose a factual question, the [subjective belief component] would in many cases effectively leave the ultimate resolution of the probable cause element to the jury, rather than to the court." Id., 879. Second, "[a]llowing inadequate research to serve as an independent basis for proving the absence of probable cause on the part of an attorney would tend to create a conflict of interest between the attorney and client, tempting a cautious attorney to create a record of diligence by performing extensive legal research, not for the benefit of his client, but simply to protect himself from his client's adversaries in the event the initial suit fails."[7] Id., 883.

---

[7] The court was careful to note, however, that "as with the question of the defendant's subjective belief in the tenability of the claim, if the trial court determines that the prior action was not objectively tenable, the extent

In *Friedman* v. *Dozorc*, 412 Mich. 1, 312 N.W.2d 585 (1981), the Michigan Supreme Court likewise rejected the *Tool Research & Engineering Corp.* standard of probable cause, stating that the standard, "while well-intentioned, is inconsistent with the role of the attorney in an adversary system"; id., 49; in that "[o]ur legal system favors the representation of litigants by counsel. Yet the foregoing standard appears skewed in favor of non-representation; the lawyer risks being penalized for undertaking to present the client's claim to a court unless satisfied, after a potentially substantial investment in investigation and research, that the claim is tenable." Id., 49–50. Such a standard, the court stated, "suggests rather ominously that every time a lawyer . . . encounters a fact adverse to the client's position . . . he must immediately question whether to persevere in the action. An attorney's evaluation of the client's case should not be inhibited by the knowledge that perseverance may place the attorney personally at risk; the next fact or the next . . . opinion may be the one that makes the case, and such developments may occur even on the eve of trial." Id., 51–52.

We agree with the supreme courts of California and Michigan that an attorney's subjective belief in the tenability of a claim and the extent of an attorney's investigation and research have no place in determining the existence of probable cause in a vexatious litigation action against an attorney and that the presence or absence of probable cause should be judged by an objective standard. That said, we nevertheless agree with—and, therefore, adopt—the Indiana Court of Appeals' articulation of an *objective* standard[8] of proba-

---

of a defendant attorney's investigation and research may be relevant to the further question of whether or not the attorney acted with malice." *Sheldon Appel Co.* v. *Albert & Oliker*, supra, 47 Cal. 3d 883.

[8] We caution that although we adopt the Indiana Court of Appeals' formulation of an *objective* standard of probable cause, we *do not* adopt its "subjective belief" component. The presence or absence of probable cause, we reiterate, should be judged by an objective inquiry.

ble cause: "[T]he objective standard which should govern the reasonableness of an attorney's action in instituting litigation for a client is whether the claim merits litigation against the defendant in question on the basis of the facts known to the attorney when suit is commenced. The question is answered by determining that *no* competent and reasonable attorney familiar with the law of the forum would consider that the claim was worthy of litigation on the basis of the facts known by the attorney who instituted suit." (Emphasis added.) *Wong* v. *Tabor*, supra, 422 N.E.2d 1288. We are mindful that "[r]easonable lawyers can differ, some seeing as meritless suits which others believe have merit, and some seeing as totally and completely without merit suits which others see as only marginally meritless. Suits which *all* reasonable lawyers agree totally lack merit—that is, those which lack probable cause—are the least meritorious of all meritless suits. Only this subgroup of meritless suits present no probable cause." (Emphasis in original; internal quotation marks omitted.) *Roberts* v. *Sentry Life Ins.*, 76 Cal. App. 4th 375, 382, 90 Cal. Rptr. 2d 408 (1999), review denied, 2000 Cal. LEXIS 1059 (February 16, 2000). "This lenient standard for bringing a civil action reflects the important public policy of avoiding the chilling of novel or debatable legal claims and allows attorneys and litigants to present issues that are arguably correct, even if it is extremely unlikely that they will win . . . ." (Internal quotation marks omitted.) *Padres L.P.* v. *Henderson*, 114 Cal. App. 4th 495, 517, 8 Cal. Rptr. 3d 584 (2003), review denied, 2004 Cal. LEXIS 3174 (April 14, 2004).

We turn now to the issue of probable cause as applied to the facts of this case. As we have already noted, the law firm initiated the underlying litigation beyond the applicable statutes of limitation and, thus, whether it had probable cause to do so depends on whether, on the basis of the facts known by the law firm, a reasonable

attorney familiar with the law of the forum would believe that the statutes of limitation could be tolled. We conclude, on the basis of those facts, that a reasonable attorney familiar with the law of this state would believe that the statutes of limitation could be tolled by fraudulent concealment on the part of Retirement Centers.[9]

Under General Statutes § 52-595, "[i]f any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence." "[T]o prove fraudulent concealment, the plaintiffs were required to show: (1) a defendant's actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiffs' cause of action; (2) that defendant's intentional concealment of these facts from the plaintiffs; and (3) that defendant's concealment of the facts for the purpose of obtaining delay on the plaintiffs' part in filing a complaint on their cause of action." *Bartone* v. *Robert L. Day Co.*, 232 Conn. 527, 533, 656 A.2d 221 (1995). "The actions of the defendant must be directed to the very point of obtaining the delay of which he afterward seeks to take advantage by pleading the statute." (Internal quotation marks omitted.) *Connell* v. *Colwell*, 214 Conn. 242, 251, 571 A.2d 116 (1990). "To meet this burden, it was not sufficient for the plaintiffs to prove merely that it was more likely than not that the defendants had concealed the

---

[9] Falls Church argues that most, if not all, of the claims asserted by the law firm in the underlying action relied on Retirement Centers' statutory disclosure duty under General Statutes § 17b-529, and that the "explicit" six year limitations period in that statute cannot be tolled. We disagree. Because the exception contained in General Statutes § 52-595, the fraudulent concealment statute, "constitutes a clear and unambiguous general exception to any statute of limitations that does not specifically preclude its application"; *Connell* v. *Colwell*, 214 Conn. 242, 246 n.4, 571 A.2d 116 (1990); it applies to § 17b-529.

cause of action. Instead, the plaintiffs had to prove fraudulent concealment by the more exacting standard of clear, precise, and unequivocal evidence." (Internal quotation marks omitted.) *Bartone* v. *Robert L. Day Co.*, supra, 533.

The first *Bartone* factor that must be established in order to conclude that a defendant is guilty of fraudulent concealment is the defendant's actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiff's cause of action. Id. Falls Church argues that the court failed even to address the first *Bartone* factor. On the contrary, the court was quite explicit in addressing that factor. It stated, albeit in its discussion of *Bartone*'s third factor, that the law firm could demonstrate not only that Retirement Centers "knew its disclosure statements contained misleading information"—the 1988 disclosure statement derived from a preliminary financial report that was based on information that Retirement Centers acknowledged "should not have been circulated publicly,[10] and yet it was the financial information used for the one and only disclosure statement until the 1991 statement"[11]—but also that it "knew their actions were legally questionable," as evidenced by the fact that Retirement Centers "received a letter from the department of aging in 1990 that declared the disclosure statement to be illegal, but . . . never corrected their statement and continued to rely on it."

Falls Church also argues that even if the law firm offered sufficient evidence to demonstrate that Retire-

---

[10] A February 10, 1989 Retirement Centers memo stated: "If there were any problems or misunderstandings which have occurred I would say that the June [Retirement Centers] numbers which were stamped First Preliminary-Subject To Change should not have been circulated publicly, until the items that have been mentioned earlier had been reviewed and clarified. Its purpose was as intended—First Preliminary-Subject To Change."

[11] Also, the 1988 statement indicated that East Hill Woods was being sponsored by the Lutheran Home Retirement Corporation, even though the sponsorship agreement had not yet been reduced to writing.

ment Centers knowingly delivered misleading disclosure statements to potential residents, the law firm still failed to satisfy the first *Bartone* factor. Specifically, Falls Church contends that the law firm was required to prove that Retirement Centers "was aware of the facts necessary to establish the plaintiffs' cause of action"; and because all of the negligence theories advanced by the law firm required proof of a breach of a duty, causation and damages, "[i]t would have been impossible for Retirement Centers to have had any actual knowledge of the residents' cause of action prior to 1991 because the facts necessary for the cause of action had not yet developed" (i.e., the retirement community had not yet opened and the financial difficulties that led to its bankruptcy had not yet materialized). The United States Court of Appeals for the Second Circuit has suggested that "specific knowledge is not necessary . . . ." *Martinelli* v. *Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 425 (2d Cir. 1999). In *Martinelli*, the Second Circuit explained that "[t]he import of *Bartone*'s first element is that defendant's knowledge must be actual not imputed. Although the clause went on to state that the knowledge needed to be of the 'facts necessary to establish plaintiff's cause of action,' that language was beside the point that the *Bartone* court was making." Id. According to the Second Circuit, "to establish the first *Bartone* factor it is sufficient to show that the defendant had and concealed actual awareness of facts that created a *likely potential for harm* . . . ." (Emphasis in original.) Id., 426.

Under *Bartone*'s second factor, a plaintiff alleging fraudulent concealment must establish the defendant's intentional concealment from the plaintiff of the facts necessary to establish the plaintiff's cause of action. *Bartone* v. *Robert L. Day Co.*, supra, 232 Conn. 533. Our Supreme Court "has not yet decided whether affirmative acts of concealment are always necessary to

satisfy the requirements of . . . § 52-595." (Internal
quotation marks omitted.) *Connell* v. *Colwell*, supra,
214 Conn. 250 n.6; *Fichera* v. *Mine Hill Corp.*, 207 Conn.
204, 215, 541 A.2d 472 (1988). Nevertheless, federal case
law existed at the time the law firm initiated the underly-
ing action, suggesting that although fraudulent conceal-
ment generally requires an affirmative act of
concealment, nondisclosure is sufficient when the
defendant has a fiduciary duty to disclose material facts.
See *Hamilton* v. *Smith*, 773 F.2d 461, 468 (2d Cir. 1985)
("[t]o establish fraudulent concealment under Connect-
icut law, a plaintiff must show [inter alia] that . . .
absent a fiduciary relationship, the defendant was guilty
of some affirmative act of concealment"); *In re Colonial
Ltd. Partnership Litigation*, 854 F. Sup. 64, 90 (D. Conn.
1994) ("[a]bsent a fiduciary relationship, defendants
must have been guilty of an affirmative act of conceal-
ment, of more than mere silence").

"[A] fiduciary or confidential relationship is charac-
terized by a unique degree of trust and confidence
between the parties, one of whom has superior knowl-
edge, skill or expertise and is under a duty to represent
the interests of the other. . . . The superior position
of the fiduciary or dominant party affords him great
opportunity for abuse of the confidence reposed in
him." (Internal quotation marks omitted.) *Cadle Co.* v.
*D'Addario*, 268 Conn. 441, 455, 844 A.2d 836 (2004).
Our Supreme Court "has . . . specifically refused to
define a fiduciary relationship in precise detail and in
such a manner as to exclude new situations, choosing
instead to leave the bars down *for situations in which
there is a justifiable trust confided on one side and
a resulting superiority and influence on the other.*"
(Emphasis added; internal quotation marks omitted.)
*Alaimo* v. *Royer*, 188 Conn. 36, 41, 448 A.2d 207 (1982).

Here, in concluding that it was reasonable for the
law firm to believe that it could establish a fiduciary

relationship between the plaintiffs in the underlying action and Retirement Centers, the court stated that "there was ample evidence concerning [Retirement Centers'] complete knowledge and control of [the retirement community's] development, the unequal bargaining position, the advanced age of the plaintiffs, [and] the placement of trust and the disclosure of confidential information by the . . . residents . . . ." Indeed, the plaintiffs were elderly, in their 80s and 90s, referred to by employees of Retirement Centers as "clients," each of whom was required to complete a confidential data application, which asked them to list assets, income, health conditions or problems, etc., before they entered into a complex contract for what "was to be not only their last major investment—one assured to be safe—but their future home and medical care." One plaintiff, whom the court deemed representative of the entire group, testified that she came to rely on the employees' "knowledge, expertise, advice and trusting relationship in this investment decision which involved a substantial portion of her life savings." Given our Supreme Court's refusal to offer a rigid definition of a fiduciary relationship, we cannot say that it was unreasonable on the part of the law firm to believe that there existed, in this case, a situation in which there was "a justifiable trust confided on one side and a resulting superiority and influence on the other." (Internal quotation marks omitted.) *Alaimo* v. *Royer*, supra, 188 Conn. 41.

Falls Church disagrees, noting that Judge Hodgson, in her memorandum of decision on its motion for summary judgment in the underlying action, categorically rejected the law firm's fiduciary relationship argument, which, it argues, suggests that she did not deem that argument reasonable. Falls Church refers to the following language in Judge Hodgson's decision: "Neither the allegations nor the materials submitted even remotely

creates a factual dispute as to a fiduciary relationship or a fiduciary duty owed or representations that a duty would be performed by [Retirement Centers] on behalf of the plaintiffs rather than on behalf of the party with whom they contracted." "Probable cause [however] may be present even where a suit lacks merit. Favorable termination of the suit often establishes lack of merit, yet the plaintiff in [vexatious litigation] must *separately* show lack of probable cause." (Emphasis in original.) *Roberts* v. *Sentry Life Ins.*, supra, 76 Cal. App. 4th 382. Judge Berger acknowledged the distinction between a suit that lacks merit and one that lacks probable cause by stating that "the determination for [Judge Berger] is not equivalent to that made by Judge Hodgson." Hence, his conclusion, with which we agree: "Of course, [Judge Hodgson] found, based on the information supplied to her, that the plaintiffs could not prove a fiduciary relationship. [Judge Berger, however] conducted a multiday evidentiary hearing and interpret[ed] the evidence with a different result. [Judge Berger was] concerned only with the probable cause burden . . . ." As we have already noted, the lower threshold of probable cause "allows attorneys and litigants to present issues that are arguably correct, even if it is extremely unlikely that they will win . . . ." (Internal quotation marks omitted.) *Padres L.P.* v. *Henderson*, supra, 114 Cal. App. 4th 517. "Were we to conclude . . . that a claim is unreasonable wherever the law would clearly hold for the other side, we could stifle the willingness of a lawyer to challenge established precedent in an effort to change the law. The vitality of our common law system is dependent upon the freedom of attorneys to pursue novel, although potentially unsuccessful, legal theories." *Wong* v. *Tabor*, supra, 422 N.E.2d 1288.

The final *Bartone* factor requires a plaintiff to show the defendant's intentional concealment of the facts necessary to establish the plaintiff's cause of action for

the purpose of obtaining delay on the plaintiff's part in filing a complaint on their cause of action. *Bartone* v. *Robert L. Day Co.*, supra, 232 Conn. 533. "Fraudulent concealment for purposes of tolling the statute of limitations must not be presumed, but must be strictly proven with clear, precise and unequivocal evidence. . . . Nonetheless, a reasonable inference that a defendant's acts of concealment were aimed at delaying or preventing legal action is a recognized basis upon which to toll the statute of limitations. See *Martinelli* [v. *Bridgeport Roman Catholic Diocesan Corp.*, 989 F. Sup. 110, 115 (D. Conn. 1997)]; *Puro* [v. *Henry*, 188 Conn. 301, 310, 449 A.2d 176 (1982)] (holding that fraud may be presumed by circumstantial evidence; the test of the sufficiency of proof by circumstantial evidence is whether rational minds could reasonably and logically draw the inference)." (Citations omitted; internal quotation marks omitted.) *Fenn* v. *Yale University*, 283 F. Sup. 2d 615, 637 (D. Conn. 2003).

Falls Church argues that there simply was no evidence that Retirement Centers concealed anything for the purpose of delaying the filing of the plaintiffs' lawsuit. We disagree. The court found that the law firm could establish that Retirement Centers entered into residence agreements with the plaintiffs despite knowing that the disclosure statements distributed to the plaintiffs contained misleading information (i.e., it could establish that Falls Church violated its statutory disclosure duty under § 17b-529); that Retirement Centers knew its actions were legally questionable—by way of a letter that Retirement Centers received from the department of aging informing it that its disclosure statement was unacceptable, that it was in violation of state law and that it was no longer to be used; and that despite all that knowledge, Retirement Centers neither corrected nor ceased to rely on that statement. In fact, the court noted that although many of the plaintiffs

signed their residence agreements after that disclosure statement had been approved, they were not given any new information from Retirement Centers prior to moving in several years later. We agree with the court that the cumulative effect of those facts could lead a reasonable attorney to believe that the purposeful delay of a lawsuit could be established.

In sum, we conclude on the basis of the facts known to the law firm, that a reasonable attorney familiar with the law of this state would believe that the applicable statutes of limitation could be tolled by fraudulent concealment on the part of Retirement Centers. Accordingly, the court's decision that Falls Church failed to prove that the law firm lacked probable cause to institute the underlying action was proper.

The judgment is affirmed.

In this opinion the other judges concurred.