FALLS CHURCH GROUP, LTD. *v.* TYLER, COOPER
AND ALCORN, LLP
(SC 17489)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

Argued October 26, 2006—officially released January 23, 2007

*Michael J. Walsh*, with whom was *Ann Walsh Henderson*, for the appellant (plaintiff).

*Patrick M. Noonan*, with whom, on the brief, was *Matthew H. Geelan*, for the appellee (defendant).

*Opinion*

KATZ, J. This certified appeal arises from a common-law and statutory vexatious litigation action[1] by the plaintiff, Falls Church Group, Ltd. (Falls Church), against the defendant, Tyler, Cooper and Alcorn, LLP (law firm), based upon the law firm's prosecution of a time barred class action against Falls Church's predecessor in interest. The law firm had brought the action on behalf of a group of senior citizens who had lost considerable sums of money after executing residence agreements allowing them to live in a continuing care retirement community that had been marketed by Falls Church's predecessor in interest. Falls Church claimed that the law firm had acted without probable cause and with malice in prosecuting the underlying action well after the limitations period had expired, contending that the law firm reasonably could not have believed that sufficient factual evidence existed to support any theory under which the statute of limitations would have been tolled. Following a trial to the court, which resulted in judgment for the law firm based upon the trial court's determination that Falls Church had failed to prove a lack of probable cause for bringing the action, Falls Church appealed to the Appellate Court, which affirmed the judgment. *Falls Church Group, Ltd.* v. *Tyler, Coo-*

---

[1] General Statutes § 52-568 provides: "Any person who commences and prosecutes any civil action or complaint against another, in his own name or the name of others, or asserts a defense to any civil action or complaint commenced and prosecuted by another (1) without probable cause, shall pay such other person double damages, or (2) without probable cause, and with a malicious intent unjustly to vex and trouble such other person, shall pay him treble damages."

*per & Alcorn, LLP,* 89 Conn. App. 459, 461, 874 A.2d 266 (2005).

This court thereafter granted Falls Church's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly determine that the trial court was correct in concluding that [Falls Church], in this vexatious litigation lawsuit, failed to prove that the [law firm] lacked probable cause to initiate the underlying action?" *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP,* 275 Conn. 908, 882 A.2d 670 (2005). We conclude that the Appellate Court properly affirmed the trial court's judgment determining that a reasonable attorney familiar with Connecticut jurisprudence could have believed that the applicable statute of limitations would have been tolled by the doctrine of fraudulent concealment.[2]

The Appellate Court opinion sets forth the following relevant facts and procedural history. "On March 1, 1988, [Falls Church's predecessor in interest] Retirement Centers of America, Inc. (Retirement Centers), entered into a consulting agreement and a project management agreement with East Hill Woods, Inc. (East Hill Woods), to provide consulting and marketing services to East Hill Woods in connection with the development of a continuing care retirement community in Southbury. As compensation for its services, Retirement Centers was to receive a consulting fee, which East Hill Woods would disburse in portions at different phases of the retirement community's development.

"Retirement Centers had among its marketing objectives the encouragement of prospective residents to

---

[2] General Statutes § 52-595 provides: "If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence."

enter into residence agreements. Under those agreements, an entry fee, which ranged from $117,000 to more than $300,000, entitled residents to lifetime use of their living unit and unlimited nursing care if they could no longer live independently. When residents left the community, died or sold their units, they or their estates would, subject to certain conditions and exceptions, receive a refund of 94 percent of the entrance fee. Upon execution of the agreements, residents were required to pay a deposit of 5 percent of the entrance fee, $200 of which was nonrefundable if they chose ultimately not to move into the community.

"The first residence agreement was signed on July 7, 1988, approximately thirteen months before East Hill Woods commenced construction of the retirement community. The last residence agreement during Retirement Centers' tenure as East Hill Woods' marketing consultant was executed in December, 1990. Shortly thereafter, Retirement Centers and East Hill Woods entered into a settlement agreement, effective January 18, 1991, terminating Retirement Centers' role in the project. Under that agreement, East Hill Woods was to pay Retirement Centers $222,403 when residents occupied 85 percent of the community's living units and $192,000 pursuant to a promissory note payable at the rate of $6000 per month for thirty-four months. As of the settlement agreement's effective date, the retirement community remained unoccupied. It was not until April, 1991, that the first resident moved into the community.

"Six years later, financial difficulties forced East Hill Woods into bankruptcy, which compromised the right of residents to receive their refund of 94 percent of the entrance fee. The next year, on January 7, 1998, the law firm commenced the underlying action by filing a complaint on behalf of 177 plaintiffs (residents, former

residents or their estates)[3] against several defendants, including Retirement Centers. The counts directed toward Retirement Centers were made on behalf of fifty-three plaintiffs who had signed residence agreements before the effective date of Retirement Centers' settlement agreement with East Hill Woods. Although those counts present different factual theories, each one stems from Retirement Centers' alleged failure to satisfy its statutory disclosure duty under General Statutes § 17b-529,[4] the statute that creates a cause of action in favor of any person contracting with a continuing care facility who, before signing the contract, is provided either with a misleading disclosure statement or not provided with a disclosure statement at all. On May 4, 1998, Falls Church, Retirement Centers' successor in interest, was substituted as a defendant by stipulation of the parties.

"When the law firm initiated the underlying action, it was fully cognizant that the statutes of limitation

---

[3] Hereinafter, references to the plaintiffs are to these 177 individuals in the underlying action.

[4] General Statutes § 17b-529 (a) provides: "Any person who as, or on behalf of, a provider, enters into a contract for continuing care at a facility without having first delivered a disclosure statement meeting the requirements of section 17b-522 to the person contracting for the continuing care, or enters into a contract for continuing care at a facility with a person who has relied on a disclosure statement that omits to state a material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they are made, not misleading, is liable to the person contracting for the continuing care for damages and repayment of all fees paid to the provider, facility or person, less the reasonable value of care and lodging provided to the resident by or on whose behalf the contract for continuing care was entered into prior to discovery of the violation, misstatement or omission or to the time the violation, misstatement or omission should reasonably have been discovered, together with interest thereon at the legal rate for judgments, and court costs and reasonable attorneys fees. An action to enforce liability pursuant to this section shall not be maintained unless brought within six years after the execution of the contract for continuing care giving rise to the liability."

had run on the plaintiffs' claims against Falls Church. Indeed, before the law firm filed the complaint in that action, it had undertaken to induce the legislature to modify the limitations period set forth in § 17b-529. The law firm sought to enlarge the limitations period in § 17b-529 from six to seven years and to change the date on which the limitations period would begin to run, from the date the residence agreement was signed to the date the resident moved into the facility. Its legislative efforts ultimately proved unsuccessful.

"On September 8, 1998, Falls Church filed a motion for summary judgment, arguing that the plaintiffs' claims were barred by the applicable statutes of limitation. The law firm filed an objection, asserting various tolling arguments.[5] The court, *Hodgson, J.*, rejected the law firm's attempts to evade the statutes of limitation and rendered summary judgment in favor of Falls Church on all counts.

"Falls Church then brought the vexatious litigation action that is the subject of this appeal. Falls Church asserted claims for both common-law and statutory vexatious litigation in its complaint, the thrust of which was that the law firm instituted the underlying action without probable cause and with malice because it knew that Retirement Centers had ended its involvement with East Hill Woods in January, 1991—seven years before the law firm initiated the action—and that it knew, or should have known, that all of the . . . claims were barred by statutes of limitation.

"The law firm filed a motion to bifurcate the probable cause issue from the issues of malice and damages. The

---

[5] Specifically, the law firm relied on four different tolling doctrines to avoid the statute of limitations bar, due to Retirement Centers' fraudulent concealment, its continuing course of conduct, its aiding and abetting other defendants, and its fiduciary or special relationship with the underlying plaintiffs.

court, *Berger, J.*, granted the motion and conducted a multiday evidentiary hearing, after which it issued a thirty-seven page memorandum of decision. In its decision, the court discussed, in detail, the evidence submitted at the hearing, stating, inter alia, that East Hill Woods was created by Retirement Centers, had its board and officer ranks stacked with employees of Retirement Centers, but did not have a single employee of its own until 1991; that employees of Retirement Centers had signed the project management and consulting agreements on behalf of East Hill Woods; that those agreements, which listed Retirement Centers' myriad duties, attested to Retirement Centers' clear understanding and control of the retirement community's development; that employees of Retirement Centers required the plaintiffs in the underlying action, individuals in their 80s and 90s, who were called 'clients,' to complete a confidential data application that asked them to list assets, income, health problems or conditions, etc.; and that the plaintiffs received disclosure statements that contained misleading information about the retirement community's financial well-being.[6]

"The court then addressed whether it was reasonable for the law firm to believe that sufficient factual evidence existed to support a tolling of the statutes of limitation on the basis of the following tolling doctrines and related arguments: (1) fraudulent concealment, (2) continuing course of conduct, (3) aiding and abetting,

---

[6] The trial court first determined that the decision by Judge Hodgson granting Falls Church's motion for summary judgment in the underlying action was not determinative of all the factual issues in the present case. Specifically, because the parties never had raised the issue of whether the law firm had probable cause for bringing the action against Falls Church and because Judge Hodgson never had addressed that issue, the trial court in the present case determined that probable cause had not been fully litigated in the prior action. Accordingly, the trial court determined that this issue was properly before it.

(4) equitable estoppel, (5) General Statutes § 52-590[7] and (6) the law firm's effort to persuade the legislature to modify § 17b-529. The court concluded that the law firm had probable cause to rely on three of its tolling arguments (i.e., fraudulent concealment, continuing course of conduct, and aiding and abetting) and ruled, therefore, that Falls Church failed to prove that the law firm lacked probable cause to initiate the underlying action." *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 89 Conn. App. 461–65.

Falls Church then appealed from the trial court's judgment in favor of the law firm to the Appellate Court, which determined that the trial court properly had concluded that the law firm had probable cause to prosecute the action and affirmed the court's judgment.[8] This certified appeal followed.

On appeal to this court, Falls Church challenges the Appellate Court's judgment affirming the trial court's finding of probable cause, as well as the standard the Appellate Court applied in arriving at its decision. Spe-

[7] General Statutes § 52-590 provides: "In computing the time limited in the period of limitation prescribed under any provision of chapter 925 or this chapter, the time during which the party, against whom there may be any such cause of action, is without this state shall be excluded from the computation, except that the time so excluded shall not exceed seven years."

[8] On appeal to the Appellate Court, Falls Church claimed that the trial court improperly had bifurcated the trial into separate phases. The Appellate Court concluded that Falls Church had waived that claim by agreeing to the procedure. *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 89 Conn. App. 466. That determination is not at issue in this certified appeal. Falls Church also claimed that the trial court improperly had concluded that it had failed to prove that the law firm lacked probable cause to initiate the underlying action. Although Falls Church asserted six grounds on which it claimed that the trial court should have found that the law firm did not have probable cause to circumvent the statute of limitations bar and the law firm addressed the trial court's reliance on several of these grounds in its decision, the Appellate Court addressed only the ground of fraudulent concealment as a basis to defeat the statute of limitations bar in affirming the trial court's conclusion that the law firm had probable cause to bring the underlying action.

cifically, Falls Church contends that the Appellate Court improperly established a new standard of probable cause applicable to vexatious litigation actions brought against attorneys that is more stringent than the standard applied to such actions against litigants generally. Falls Church further contends that the Appellate Court's determination regarding fraudulent concealment was improper. Finally, Falls Church contends that this court should reverse the judgment of the Appellate Court because the trial court's conclusions regarding the continuing course of conduct doctrine and the aiding and abetting theory also were improper.

The law firm contends in response that the standard applied by the Appellate Court, as well as its judgment affirming the trial court's determination that the law firm had probable cause to assert a claim of fraudulent concealment, were proper. Additionally, the law firm contends that the trial court properly concluded that probable cause existed with respect to the continuing course of conduct doctrine and the law firm's aiding and abetting theory. We agree with Falls Church that the Appellate Court articulated an improper standard, but nevertheless agree with the law firm that the Appellate Court properly affirmed the trial court's decision that the law firm had probable cause to assert a claim of fraudulent concealment.[9]

I

To address Falls Church's claim as to the appropriate standard of proof, we begin with our well established case law outlining the essential elements of a common-

---

[9] Because we agree with the Appellate Court's determination regarding the trial court's decision that the law firm had probable cause to prosecute the underlying action based on a claim of fraudulent concealment, we need not address Falls Church's additional claims as to the trial court's conclusions regarding the continuing course of conduct doctrine and the aiding and abetting theory as alternate bases upon which the law firm reasonably could have relied to toll the statutes of limitations.

law claim for vexatious litigation. "A vexatious suit is a type of malicious prosecution action, differing principally in that it is based upon a prior civil action, whereas a malicious prosecution suit ordinarily implies a prior criminal complaint. To establish either cause of action, it is necessary to prove want of probable cause, malice and a termination of suit in the plaintiff's favor. *Calvo* v. *Bartolotta*, 112 Conn. 396, 397, 152 A. 311 [1930]; *Schaefer* v. *O. K. Tool Co.*, 110 Conn. 528, 148 A. 330 [1930]. Probable cause is the knowledge of facts sufficient to justify a reasonable person in the belief that there are reasonable grounds for prosecuting an action. *Paranto* v. *Ball*, 132 Conn. 568, 571, 46 A.2d 6 [1946]; *McGann* v. *Allen*, 105 Conn. 177, 186, 134 A. 810 [1926]. Malice may be inferred from lack of probable cause. *Zenik* v. *O'Brien*, 137 Conn. 592, 596–97, 79 A.2d 769 [1951]; *Thompson* v. *Beacon Valley Rubber Co.*, 56 Conn. 493, 496, 16 A. 554 [1888]. The want of probable cause, however, cannot be inferred from the fact that malice was proven. *McGann* v. *Allen*, supra, 187." *Vandersluis* v. *Weil*, 176 Conn. 353, 356, 407 A.2d 982 (1978). A statutory action for vexatious litigation under General Statutes § 52-568; see footnote 1 of this opinion; differs from a common-law action only in that a finding of malice is not an essential element, but will serve as a basis for higher damages. In either type of action, however, "[t]he existence of probable cause is an absolute protection against an action for malicious prosecution, and what facts, and whether particular facts, constitute probable cause is always a question of law." *Brodrib* v. *Doberstein*, 107 Conn. 294, 296, 140 A. 483 (1928). Accordingly, our review is plenary. *State* v. *Gibson*, 270 Conn. 55, 66, 850 A.2d 1040 (2004).

The test for deciding whether a *litigant* acted with probable cause also is well settled. "For purposes of a vexatious suit action, [t]he legal idea of probable cause is a bona fide belief in the existence of the facts essential

under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. . . . Probable cause is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of. . . . Thus, in the context of a vexatious suit action, the defendant lacks probable cause if he lacks a reasonable, good faith belief in the facts alleged and the validity of the claim asserted." (Citations omitted; internal quotation marks omitted.) *DeLaurentis* v. *New Haven*, 220 Conn. 225, 256, 597 A.2d 807 (1991); accord *Wall* v. *Toomey*, 52 Conn. 35, 36 (1884). Accordingly, the probable cause standard applied to a vexatious litigation action against a litigant is a purely objective one.

The standard with respect to an attorney's decision to file a lawsuit on a litigant's behalf, however, is less settled. Although we have not addressed directly a vexatious litigation action against an attorney, we find instructive this court's decision in *Mozzochi* v. *Beck*, 204 Conn. 490, 495, 529 A.2d 171 (1987), in which the court addressed a claim for abuse of process[10] arising from allegedly defamatory statements made by the attorney in the complaint in the underlying action. The principal issue in that case was "whether a cause of action for abuse of process may be brought to recover damages from attorneys who allegedly pursued litiga-

---

[10] As this court explained in *Mozzochi* v. *Beck*, supra, 204 Conn. 494, "[a]n action for abuse of process lies against any person using 'a legal process against another in an improper manner or to accomplish a purpose for which it was not designed.'" The abuse occurs "through the employment of process for a wrongful and malicious purpose to attain an unjustifiable end or an object that the particular process was not meant to effect." 1 F. Harper, F. James & O. Gray, Torts (2d Ed. 1986) § 4.9. In other words, the action focuses on "the use of 'a legal process . . . against another primarily to accomplish a purpose for which it is not designed . . . .'" *Mozzochi* v. *Beck*, supra, 494, quoting 3 Restatement (Second), Torts § 682 (1977).

tion despite their discovery that their client's claim lacked merit." Id., 491. The court held that, an attorney's duty not to pursue groundless litigation "does not give rise to a third party action for abuse of process unless the third party can point to specific misconduct intended to cause specific injury outside of the normal contemplation of private litigation." Id., 497; see also *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, 260 Conn. 766, 776, 802 A.2d 44 (2002) (relying on *Mozzochi* to support plaintiff's abuse of process claim against defendant litigants for wrongful and excessive execution of judgment).

In discussing the scope of the potential liability of an attorney for abuse of process arising out of the attorney's professional responsibility to clients, which must be reconciled with the court's "responsibility to assure unfettered access to our courts"; *Mozzochi* v. *Beck*, supra, 204 Conn. 494; this court explained the need to "[afford] to attorneys, as officers of the court, absolute immunity from liability for allegedly defamatory communications in the course of judicial proceedings." Id., 494–95. The court cautioned, however, that, "[f]or other causes of action . . . the exigencies of the adversary system have not been deemed to require absolute immunity for attorneys. We have assumed, without discussion, that an attorney may be sued in an action for vexatious litigation, arguably because that cause of action has built-in restraints that minimize the risk of inappropriate litigation." Id., 495; see also 3 Restatement (Second), Torts § 586 (1977) ("[a]n attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding"). Thus, in *Mozzochi* v. *Beck*, supra, 495, although the court recognized the

need to afford attorneys special, limited protection from liability in certain abuse of process actions to ensure their clients' access to the courts, it suggested that no special protections were necessary to vindicate those interests under the existing standard for vexatious litigation actions.

In the present case, the Appellate Court addressed this court's conclusion in *Mozzochi* that an action for the unauthorized use of legal process could be brought against an attorney, and in particular noted our hesitancy to adopt rules that would "have a chilling . . . effect on would-be litigants of justiciable issues." (Internal quotation marks omitted.) *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 89 Conn. App. 468 n.5, quoting *Mozzochi* v. *Beck*, supra, 204 Conn. 495. Guided by the few decisions of courts in other jurisdictions that have developed special standards of probable cause applicable to vexatious litigation actions against attorneys, the Appellate Court expressed its view that, "an attorney's subjective belief in the tenability of a claim and the extent of an attorney's investigation and research have no place in determining the existence of probable cause in a vexatious litigation action against an attorney and . . . the presence or absence of probable cause should be judged by an objective standard." *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 473. The Appellate Court then articulated the following test: "[T]he objective standard which should govern the reasonableness of an attorney's action in instituting litigation for a client is whether the claim merits litigation against the defendant in question on the basis of the facts known to the attorney when suit is commenced. The question is answered by determining that *no* competent and reasonable attorney familiar with the law of the forum would consider that the claim was worthy of litigation on the basis of the facts known by the attorney who

instituted suit." (Emphasis in original; internal quotation marks omitted.) Id., 474.

We agree with the Appellate Court that the presence of probable cause should be judged by an objective standard. We disagree, however, with that court's articulation of the standard.

At the outset we note that, as the Appellate Court recognized, there is a division of authority among the few jurisdictions that have examined the issue of whether, in order to maintain the appropriate balance between competing policy considerations, a claim for vexatious litigation against an attorney should be judged by a general objective standard or a higher standard, comprising both subjective and objective components. We begin there. In *Wong* v. *Tabor*, 422 N.E.2d 1279, 1287–88 (Ind. App. 1981), the Indiana Court of Appeals adopted the objective and subjective test that had been set forth by the California Court of Appeal in *Tool Research & Engineering Corp.* v. *Henigson*, 46 Cal. App. 3d 675, 683, 120 Cal. Rptr. 291 (1975). In adopting that test, the *Wong* court articulated the following standard: "An attorney has probable cause to represent a client in litigation when, after a reasonable investigation and industrious search of legal authority, he has an honest belief that his client's claim is tenable in the forum in which it is to be tried. . . . The test is twofold. The attorney must entertain a subjective belief in that the claim merits litigation and that belief must satisfy an objective standard." (Internal quotation marks omitted.) *Wong* v. *Tabor*, supra, 1287. "[The objective standard] is whether the claim merits litigation against the defendant in question on the basis of the facts known to the attorney when suit is commenced . . . [a] question . . . answered by determining that no competent and reasonable attorney familiar with the law of the forum would consider that the claim was worthy of litigation on the basis of the facts known

by the attorney who instituted suit." Id., 1288. *Wong* therefore requires that, before answering the question of whether a claim merits litigation against a particular defendant, it must be determined whether the attorney subjectively believed that the claim was worthy of litigation. Id.

Thereafter, however, in *Sheldon Appel Co.* v. *Albert & Oliker*, 47 Cal. 3d 863, 877–82, 765 P.2d 498, 254 Cal. Rptr. 336 (1989) (en banc), the California Supreme Court overturned the *Tool Research & Engineering Corp.* decision, concluding that the objective standard alone was more consistent with the role that the probable cause element plays in a vexatious litigation claim. That court reasoned that, although "the malice element is directly concerned with the *subjective* mental state of the defendant in instituting the prior action, the probable cause element calls on the trial court to make an objective determination of the reasonableness of the defendant's conduct, i.e., to determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable. The resolution of that question of law calls for the application of an *objective* standard to the facts on which the defendant acted. . . . Because the malicious prosecution tort is intended to protect an individual's interest in freedom from unjustifiable and unreasonable litigation . . . if the trial court determines that the prior action was objectively reasonable, the plaintiff has failed to meet the threshold requirement of demonstrating an absence of probable cause and the defendant is entitled to prevail." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 878. The court in *Sheldon Appel Co.* therefore rejected the subjective belief component, concluding that it fundamentally would alter the probable cause element, which "is measured by the state of the defendant's *knowledge*, not by his *intent*. It means the absence of probable cause known to the

defendant when he instituted the suit. But the standard applied to [the] defendant's consciousness is external to it. The question is not whether *he* thought the facts to constitute probable cause, but whether *the court* thinks they did." (Emphasis in original; internal quotation marks omitted.) Id., 881, quoting *Director General of Railroads* v. *Kastenbaum,* 263 U.S. 25, 27–28, 44 S. Ct. 52, 68 L. Ed. 146 (1923). Additionally, the court in *Sheldon Appel Co.* noted that, "because the issue of the attorney's subjective belief or nonbelief in legal tenability would rarely be susceptible of clear proof and, when controverted, would always pose a factual question," the ultimate resolution of the probable cause element would be left to the jury, not the court. *Sheldon Appel Co.* v. *Albert & Oliker,* supra, 879.

We find the court's reasoning in that case persuasive as to why it rejected the subjective belief component of the probable cause test. Additionally, we can find no persuasive rationale in the case law from other jurisdictions to distinguish between the probable cause test applied to attorneys who bring actions on behalf of clients and the test applied to the clients themselves. Accordingly, we reject the notion that the attorney must entertain a subjective belief that the claim merits legal action and reiterate that, "[f]or purposes of a vexatious suit action, [t]he legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a [person] of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. . . . Probable cause is the knowledge of facts, actual or apparent, strong enough to justify a reasonable [person] in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of. . . . Thus, in the context of a vexatious suit action, the defendant lacks probable cause if he lacks a reasonable, good faith belief in the facts alleged and the validity of the

claim asserted." (Citations omitted; internal quotation marks omitted.) *DeLaurentis* v. *New Haven*, supra, 220 Conn. 256.

In the present case, the Appellate Court adopted an objective only standard of probable cause, and, thus, in rejecting the *Wong* court's "subjective belief component," acted consistently in part with the standard we have applied to vexatious litigation claims against litigants. The Appellate Court nevertheless adopted the *Wong* court's formulation of the objective component of the probable cause test: "[T]he objective standard which should govern the reasonableness of an attorney's action in instituting litigation for a client is whether the claim merits litigation against the defendant in question on the basis of the facts known to the attorney when suit is commenced. The question is answered by determining that *no* competent and reasonable attorney familiar with the law of the forum would consider that the claim was worthy of litigation on the basis of the facts known by the attorney who instituted suit." (Emphasis in original; internal quotation marks omitted.) *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 89 Conn. App. 474, quoting *Wong* v. *Tabor*, supra, 422 N.E.2d 1288. In so doing, the Appellate Court explained that, "[r]easonable lawyers can differ, some seeing as meritless suits which others believe have merit, and some seeing as totally and completely without merit suits which others see as only marginally meritless. Suits which *all* reasonable lawyers agree totally lack merit—that is, those which lack probable cause—are the least meritorious of all meritless suits. Only this subgroup of meritless suits present no probable cause. . . . This lenient standard for bringing a civil action reflects the important public policy of avoiding the chilling of novel or debatable legal claims and allows attorneys and litigants to present issues that are arguably correct, even if it is

extremely unlikely that they will win . . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP,* supra, 474.

Falls Church contends that, by crafting this new and more stringent standard of probable cause that required it to prove that no competent and reasonable attorney familiar with the facts would have brought the underlying action, or, conversely, that all reasonable and competent attorneys would agree that the claim was totally without merit, the Appellate Court essentially eviscerated vexatious litigation claims against attorneys. We agree with Falls Church that the Appellate Court's articulation was improper.[11]

Our review of the Appellate Court's decision clearly indicates that it did not follow the definition of civil probable cause that was set forth by this court more than 100 years ago. That definition has not changed since this court enunciated in *Wall* v. *Toomey,* supra, 52 Conn. 36, that civil probable cause constitutes "a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." In addition, the Appellate Court's articulation of a two tier standard is inconsistent with the vexatious litigation statute, § 52-568. See footnote 1 of this opinion. That statute by its terms applies equally to claims against private litigants and attorneys and does not suggest any basis for treating probable cause differently depending on the type of defendant against whom the action is brought. More-

---

[11] We note, however, that, although its articulation of the objective test was improper, as Falls Church concedes, the Appellate Court nevertheless *applied* the traditional standard of probable cause when evaluating the second issue in this opinion, that is, whether the trial court properly concluded that the law firm had probable cause to assert a claim of fraudulent concealment pursuant to § 52-595.

over, under our case law, it is well settled that the same standard applies under the common law and the statute. "[Vexatious suit] is the appellation given in this [s]tate to the cause of action created by statute (General Statutes § 6148 [now § 52-568]) for the malicious prosecution of a civil suit . . . which we have said was governed by the same general principles as the common-law action of malicious prosecution." *Schaefer* v. *O. K. Tool Co.*, supra, 110 Conn. 534.

Although the reasonable attorney is substituted for the reasonable person in actions against attorneys, there is no reason to craft a different standard that essentially would immunize attorneys from vexatious litigation claims by requiring a claimant to prove that 100 out of 100 attorneys would have agreed that the underlying claim was without merit. Moreover, the need and desire to ensure open access to courts and vigorous representation by counsel is protected adequately, as we recognized in *Mozzochi*, by the objective standard applied under the existing rule.

## II

Applying our traditional standard for probable cause, we next examine whether the trial court properly concluded that the law firm had probable cause to assert a claim of fraudulent concealment pursuant to General Statutes § 52-595; see footnote 2 of this opinion; to toll the statute of limitations in the underlying action. As we embark upon this task, we are mindful that "[p]robable cause may be present even where a suit lacks merit. Favorable termination of the suit often establishes lack of merit, yet the plaintiff in [vexatious litigation] must *separately* show lack of probable cause." (Emphasis in original.) *Roberts* v. *Sentry Life Ins. Co.*, 76 Cal. App. 4th 375, 382, 90 Cal. Rptr. 2d 408 (1999), review denied, 2000 Cal. LEXIS 1059 (February 16, 2000). The lower threshold of probable cause "allows attorneys and liti-

gants to present issues that are arguably correct, even if it is extremely unlikely that they will win . . . ." (Internal quotation marks omitted.) *Padres L.P.* v. *Henderson*, 114 Cal. App. 4th 495, 517, 8 Cal. Rptr. 3d 584 (2003), review denied, 2004 Cal. LEXIS 3174 (April 14, 2004). "Were we to conclude . . . that a claim is unreasonable wherever the law would clearly hold for the other side, we could stifle the willingness of a lawyer to challenge established precedent in an effort to change the law. The vitality of our common law system is dependent upon the freedom of attorneys to pursue novel, although potentially unsuccessful, legal theories." *Wong* v. *Tabor*, supra, 422 N.E.2d 1288; see also Rules of Professional Conduct 3.1 ("[a] lawyer shall not bring or defend a proceeding . . . unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law"). Our examination of the evidence persuades us that, although Judge Hodgson rendered summary judgment in the underlying action based upon her determination that the plaintiffs therein had not proved the applicability of the various tolling doctrines asserted to avoid the statutes of limitation,[12] the trial court in the present action properly determined that Falls Church had failed to prove that the law firm lacked probable cause to raise the fraudulent concealment tolling doctrine and that the Appellate Court properly affirmed that determination.

Whether the law firm had probable cause to initiate the underlying litigation beyond the applicable statutes of limitation depends on whether, on the basis of the

---

[12] Because the parties in the underlying action never raised the issue of whether the law firm had probable cause to claim the various tolling provisions, the issue of probable cause was not fairly litigated and, therefore, the summary judgment rendered by the trial court in the underlying action was not dispositive of the issue in the present action. See *Ancona* v. *Manafort Bros., Inc.*, 56 Conn. App. 701, 707, 746 A.2d 184, cert. denied, 252 Conn. 953, 749 A.2d 1202 (2000).

facts known by the law firm, a reasonable attorney familiar with Connecticut law would believe that the statutes of limitation could be tolled. We begin with an examination of our law regarding fraudulent concealment, on the basis of which the law firm would have made its determination to prosecute the underlying action.

Under our case law, to prove fraudulent concealment, the law firm would have been required to show that Falls Church: (1) had actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiffs' cause of action; (2) intentionally concealed these facts from the plaintiffs; and (3) concealed the facts for the purpose of obtaining delay on the plaintiffs' part in filing a complaint on their cause of action. *Bartone* v. *Robert L. Day Co.*, 232 Conn. 527, 532, 656 A.2d 221 (1995). Moreover, the law firm would have been required to prove that Falls Church had concealed the cause of action by the more exacting standard of clear, precise, and unequivocal evidence. *Bound Brook Assn.* v. *Norwalk*, 198 Conn. 660, 666, 504 A.2d 1047, cert. denied, 479 U.S. 819, 107 S. Ct. 81, 93 L. Ed. 2d 36 (1986); *Alaimo* v. *Royer*, 188 Conn. 36, 39, 448 A.2d 207 (1982). We underscore, however, that the issue in this case is not whether the law firm established fraudulent concealment, but, rather, whether it had probable cause to believe that the test might be satisfied.

The actions, or lack thereof, at issue in the law firm's claim of fraudulent concealment were those of Falls Church's predecessor in interest, Retirement Centers.[13]

[13] The law firm brought the underlying action contending that the financial disclosure statements were inaccurate and incomplete in violation of § 17b-529. See footnote 4 of this opinion. The plaintiffs' claim of fraudulent concealment rested, inter alia, on the theory that the defendants in the underlying action knowingly and intentionally had withheld accurate information about the financial projections regarding the project's solvency, evidence of an intent to delay a lawsuit and thereby avoid liability.

Falls Church does not contend that the law firm did not have probable cause to impute Retirement Centers' actions to Falls Church.[14] Rather, Falls Church contends, in essence, that there had been no intentional concealment of the facts necessary to establish the plaintiffs' cause of action for the purpose of delaying the plaintiffs to their prejudice. The law firm responds that, notwithstanding an absence of affirmative acts of intentional concealment by Retirement Centers, because there was sufficient evidence to establish that Retirement Centers had violated its fiduciary duty to disclose material information to the plaintiffs for the purposeful delay of the plaintiffs' lawsuit, the trial court reasonably found that the law firm had probable cause to assert fraudulent concealment under § 52-595. We agree with the law firm.

We begin with the first factor—that is, the defendant's actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiff's cause of action. As the Appellate Court recognized, the trial court's lengthy memorandum of decision is replete with findings of fact, supported by documents in the record, that demonstrated Retirement Centers' knowledge of facts necessary to establish the underlying plaintiffs' cause of action: "Retirement Centers knew its disclosure statements contained misleading information—the 1988 disclosure statement derived from a preliminary financial report that was based on information that Retirement Centers acknowledged should not have been circulated publicly,[15] and yet it was the financial

---

[14] Accordingly, when we hereafter refer to the trial court's findings of facts as to Retirement Centers' actions or inactions, we implicitly refer to the essential elements of the law firm's fraudulent concealment claim against Falls Church.

[15] "A February 10, 1989 Retirement Centers memo stated: 'If there were any problems or misunderstandings which have occurred I would say that the June [Retirement Centers] numbers which were stamped First Preliminary-Subject To Change should not have been circulated publicly, until the items that have been mentioned earlier had been reviewed and clarified. Its pur-

information used for the one and only disclosure statement until the 1991 statement[16]—but also that it knew their actions were legally questionable, as evidenced by the fact that Retirement Centers received a letter from the department of aging in 1990 that declared the disclosure statement to be illegal, but . . . never corrected their statement and continued to rely on it." (Internal quotation marks omitted.) *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 89 Conn. App. 476. This evidence was sufficient to demonstrate that Retirement Centers knowingly delivered misleading disclosure statements to potential residents and, therefore, was sufficient to substantiate the trial court's determination that the law firm had probable cause to satisfy the first element of a claim of fraudulent concealment pursuant to § 52-595.

Under the second factor, the law firm had to consider whether it could establish Retirement Centers' intentional concealment from the plaintiffs of the facts necessary to establish the plaintiffs' cause of action. *Bartone* v. *Robert L. Day Co.*, supra, 232 Conn. 533. This court "has not yet decided whether affirmative acts of concealment are always necessary to satisfy the requirements of § 52-595." (Internal quotation marks omitted.) *Connell* v. *Colwell*, 214 Conn. 242, 250 n.6, 571 A.2d 116 (1990). As the Appellate Court also recognized, however, "federal case law existed at the time the law firm initiated the underlying action, suggesting that although fraudulent concealment generally requires an affirmative act of concealment, nondisclosure is sufficient when the defendant has a fiduciary duty to disclose material facts." *Falls Church Group, Ltd.* v. *Tyler,*

pose was as intended—First Preliminary-Subject To Change.' " *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 89 Conn. App. 476 n.10.

[16] "Also, the 1988 statement indicated that East Hill Woods was being sponsored by the Lutheran Home Retirement Corporation, even though the sponsorship agreement had not yet been reduced to writing." *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 89 Conn. App. 476 n.11.

*Cooper & Alcorn, LLP*, supra, 89 Conn. App. 478; see, e.g., *Hamilton* v. *Smith*, 773 F.2d 461, 468 (2d Cir. 1985) ("[t]o establish fraudulent concealment under Connecticut law, a plaintiff must show [inter alia] that . . . absent a fiduciary relationship, the defendant was guilty of some affirmative act of concealment"); *Martinelli* v. *Bridgeport Roman Catholic Diocesan Corp.*, 10 F. Sup. 2d 138, 145 (D. Conn. 1998) (plaintiff can avail itself of fraudulent concealment tolling doctrine notwithstanding absence of acts of intentional concealment by defendant if defendant violated fiduciary duty to disclose material information to plaintiff), aff'd in part, vacated and remanded in part, 196 F.3d 409 (2d Cir. 1999).

This court broadly has stated that "[a] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other. . . . The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him." (Internal quotation marks omitted.) *Cadle Co.* v. *D'Addario*, 268 Conn. 441, 455, 844 A.2d 836 (2004). We have not, however, defined that relationship "in precise detail and in such a manner as to exclude new situations, choosing instead to leave the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other." (Internal quotation marks omitted.) *Alaimo* v. *Royer*, supra, 188 Conn. 41. Indeed, the trial court in the present case recognized that, under our case law, "the fiduciary relationship is not singular. The relationship between sophisticated partners in a business venture may differ from the relationship involving lay people who are wholly dependent upon the expertise of a fiduciary. Fiduciaries appear in a variety of forms, including agents, partners, lawyers, directors, trustees, executors, receivers, bailees and

guardians. [E]quity has carefully refrained from defining a fiduciary relationship in precise detail and in such a manner as to exclude new situations." (Internal quotation marks omitted.) *Konover Development Corp.* v. *Zeller*, 228 Conn. 206, 222–23, 635 A.2d 798 (1994).

In agreeing with the trial court's conclusion that it was reasonable for the law firm to believe that it could establish a fiduciary relationship between the plaintiffs in the underlying action and Retirement Centers, the Appellate Court reasonably relied on the trial court findings that " 'there was ample evidence concerning [Retirement Centers'] complete knowledge and control of [the retirement community's] development, the unequal bargaining position, the advanced age of the plaintiffs, [and] the placement of trust and the disclosure of confidential information by the . . . residents . . . .' Indeed, the plaintiffs were elderly, in their 80s and 90s, referred to by employees of Retirement Centers as 'clients,' each of whom was required to complete a confidential data application, which asked them to list assets, income, health conditions or problems, etc., before they entered into a complex contract for what 'was to be not only their last major investment—one assured to be safe—but their future home and medical care.' " *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 89 Conn. App. 479. Additionally, one of the plaintiffs in the underlying action, "whom the [trial] court deemed representative of the entire group, testified that she came to rely on the [Retirement Centers] employees' 'knowledge, expertise, advice and trusting relationship in this investment decision which involved a substantial portion of her life savings.' "[17] Id.

---

[17] Falls Church contends unpersuasively that it was improper for the trial court to rely on the testimony of this one plaintiff to substantiate its finding of a fiduciary relationship, asserting that *one* of the people in whom that plaintiff had placed her trust became an East Hill Woods employee after Retirement Centers' role in the project at issue had terminated. Falls Church overlooks other evidence before the trial court that this plaintiff: signed her contract in 1988, while Retirement Centers still was involved in the project,

In light of this court's refusal to provide a rigid, finite definition of a fiduciary relationship, we agree with the Appellate Court that it was not unreasonable for the law firm to believe that there existed, in this case, a situation in which there was "a justifiable trust confided on one side and a resulting superiority and influence on the other." (Internal quotation marks omitted.) *Alaimo* v. *Royer*, supra, 188 Conn. 41.

Finally, to satisfy the third factor of a fraudulent concealment cause of action, the law firm had to consider whether it could establish Retirement Centers' intentional concealment of the facts necessary to establish the plaintiffs' cause of action for the purpose of delaying the plaintiffs from filing a complaint on their cause of action. *Bartone* v. *Robert L. Day Co.*, supra, 232 Conn. 533. As we have noted previously, "[t]he party alleging fraud bears the burden of proving it with clear, precise, and unequivocal evidence. [*Bound Brook Assn.* v. *Norwalk*, supra, 198 Conn. 666]; *J. Frederick Scholes Agency* v. *Mitchell*, 191 Conn. 353, 358, 464 A.2d 795 (1983). The evidence can be direct or circumstantial. *Zapolsky* v. *Sacks*, 191 Conn. 194, 200, 464 A.2d 30 (1983); *Puro* v. *Henry*, 188 Conn. 301, 310, 449 A.2d 176 (1982). Proof by circumstantial evidence is sufficient where rational minds could reasonably and logically draw the necessary inferences. *Puro* v. *Henry*, supra [310]. Each inferential fact need not be proven by the quantum of proof required to find the ultimate fact. If the jury could reasonably have reached the conclusion that the cumulative effect of the facts [it] found proven established the fraudulent concealment that would be sufficient." (Internal quotation marks omitted.) *Aksomitas* v. *Aksomitas*, 205 Conn. 93, 100–101, 529 A.2d 1314 (1987).

---

but did not move into the retirement community until 1993; relied on representatives of Retirement Centers other than this one employee; and was only one of many plaintiffs who had testified to the relationship between Retirement Centers and the plaintiffs.

Falls Church claims before this court, as it did to the Appellate Court, that there simply was no evidence that Retirement Centers had concealed anything for the specific purpose of inducing the plaintiffs to delay filing the underlying action. On the basis of our examination of the trial court's findings and the evidentiary record in support thereof, we agree with the Appellate Court that the trial court reasonably concluded that the law firm had probable cause to believe that it could prove that Retirement Centers had concealed the facts for the purpose of delaying the plaintiffs from filing their cause of action.

As the Appellate Court noted, "[t]he court found that the law firm could establish that Retirement Centers entered into residence agreements with the plaintiffs despite knowing that the disclosure statements distributed to the plaintiffs contained misleading information (i.e., it could establish that Falls Church violated its statutory disclosure duty under § 17b-529); that Retirement Centers knew its actions were legally questionable—by way of a letter that Retirement Centers received from the department of aging informing it that its disclosure statement was unacceptable, that it was in violation of state law and that it was no longer to be used; and that despite all that knowledge, Retirement Centers neither corrected nor ceased to rely on that statement. In fact, the court noted that although many of the plaintiffs signed their residence agreements after that disclosure statement had been approved, they were not given any new information from Retirement Centers prior to moving in several years later." *Falls Church Group, Ltd.* v. *Tyler, Cooper & Alcorn, LLP*, supra, 89 Conn. App. 481–82. Again, like the Appellate Court, we agree that the trial court reasonably concluded that "the cumulative effect of those facts could lead a reasonable

attorney to believe that the purposeful delay of a lawsuit could be established."[18] Id., 482.

In sum, based on the facts known to the law firm, a reasonable attorney familiar with the law of this state could believe that the applicable statute of limitations would be tolled by fraudulent concealment on the part of Retirement Centers. Accordingly, the Appellate Court properly affirmed the trial court's judgment concluding that Falls Church had failed to prove that the law firm lacked probable cause to institute the underlying action.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

---

[18] Falls Church claims that, in concluding that the law firm reasonably believed that it could prove fraudulent concealment in the underlying action, the trial court improperly attributed to Retirement Centers actions that had occurred after 1991, when the relationship between Retirement Centers and East Hill Woods terminated. Falls Church contends that actions after 1991 should not have been considered by the trial court and that actions before 1991 properly considered could not provide a basis for fraudulent concealment because the project was not then financially troubled, and the plaintiffs could have been refunded their money at this point in time. This argument is myopic because it ignores all the post-1991 facts that the trial court reasonably found, including but not limited to: Retirement Centers' extensive involvement with East Hill Woods would not end under the terms of their agreement until Retirement Centers had received its final payment from East Hill Woods in 1995; Retirement Centers knew the disclosure statements, on which the underlying plaintiffs continued to rely long after 1991, contained misleading statements masking the degree of risk associated with the project and its solvency; and, because Retirement Centers had a continuing financial interest in the facility being occupied, in that its remuneration was tied to the occupancy rate, it had an ongoing incentive not to disclose its knowledge of the financial information to the plaintiffs, some of whom did not move into the facility until 1993.